The **PHILADELPHIA HOUSING AUTHORITY**, Appellant

v.

**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EM-PLOYEES**, District Council 33, Local 934.

Commonwealth Court of Pennsylvania.

Argued June 11, 2008.

Decided Sept. 15, 2008.

Mary Theresa Metzler, Philadelphia, for appellant.

Samuel L. Spear, Philadelphia, for appellee.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge.

OPINION BY Judge FRIEDMAN.

Before this court on remand from our supreme court is the appeal of the Philadelphia Housing Authority (PHA) from the order of the Court of Common Pleas of Philadelphia County (trial court) denying PHA's petition to vacate an arbitration award that reinstated Thomas Mitchell to his employment, with full back pay, after PHA had terminated Mitchell for violating PHA's sexual harassment policy. Having reconsidered PHA's appeal in light of the principles governing review of a grievance arbitration award under the Public Employe Relations Act (PERA),[1] as recently articulated by our supreme court in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 595 Pa. 648, 939 A.2d 855 (2007), we again reverse.

## I.

PHA's sexual harassment policy (Policy) strictly prohibits discrimination or harassment on the basis of sex. The Policy defines sexual harassment to include unwelcome sexual advances, requests for sexual favors, and/or other conduct of a sexual nature that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. (R.R. at 99a.) The Policy directs any individual who feels that he or she has been a victim of sexual harass-

---

1. Act of July 23, 1970, P.L. 563, *as amended,*  43 P.S. §§ 1101.101–1101.2301.

ment in connection with his or her employment to bring the problem immediately to the attention of the employees' general manager or PHA's Equal Opportunity Officer so that corrective action may be taken. The Policy further provides that

> PHA will investigate all allegations of harassment in as prompt and confidential a manner as possible and will take appropriate corrective action when warranted. Any employee who is found, as a result of such an investigation, to have engaged in harassment or discrimination in violation of this policy will be subject to appropriate disciplinary action, up to an[d] including termination of employment.

(PHA's EEO and Sexual Harassment Policy, R.R. at 100a.) In addition, a notice posted in PHA's workplace advises that sexual harassment on the job violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. The notice provides examples of prohibited conduct, including unwelcome sexual advances, suggestive or lewd remarks and unwanted touching, and warns that, upon finding that such harassment has occurred, the company might impose any of a range of disciplinary measures, including oral or written warnings, demotion, suspension or discharge. (R.R. at 102a.)

On October 23, 2002, Mitchell, a member of the American Federation of State, County, and Municipal Employees, District Council 33, Local 934 (the Union), was discharged from his job at PHA's central warehouse facility following an investigation into a complaint of sexual harassment by co-worker Stephanie Broadnax. The Union filed a grievance on Mitchell's behalf, alleging that PHA violated Article VIII of the parties' collective bargaining agreement (CBA), which provides, in pertinent part, that "[n]o disciplinary action or discharge shall be imposed upon any employee without just cause." [2] (R.R. at 63a.) The CBA does not define the term "just cause."

The matter proceeded to arbitration, where the issue presented to the Arbitrator was "whether [PHA] had just cause to terminate [Mitchell's] employment, and, if not, what would be the appropriate remedy." [3] (Arbitrator's op. at 27, R.R. at 41a.) Following hearings, the Arbitrator issued a decision setting forth the testimony of the various witnesses at length; we summarize the relevant portions of the testimony as follows.

2. PHA is a public employer as defined by section 301 of PERA, 43 P.S. § 1101.301, and the Union is a labor organization and the exclusive representative of a bargaining unit of PHA employees within the meaning of PERA, including warehouse workers. At all relevant times, PHA and the Union have been parties to a CBA that specifies the terms and conditions of employment for members of the bargaining unit represented by the Union. (R.R. at 5a–6a, 57a, 131a.)

3. Grievance arbitration is statutory and mandatory for Pennsylvania public employers and unions. Section 903 of PERA, 43 P.S. § 1101.903. Although the parties are free to bargain over the arbitration procedure, the legislature requires that the final step in the arbitration process provide for a binding decision by an arbitrator or board of arbitrators. *Id.* Consistent with PERA requirements, the CBA lays out the procedure to be followed in order to settle any differences that might arise between PHA and the Union as to the meaning or application of, or compliance with, any CBA provisions. The procedure consists of four parts, and if no satisfactory disposition is reached in steps one through three, step four of the procedure allows the Union to submit the grievance to arbitration. When a dispute is submitted to arbitration, the CBA directs that, "[t]he decision of the arbitrator shall be final and binding upon the parties hereto, but the arbitrator shall not have the power or authority to alter or modify the terms and conditions of this Agreement." (Article VI of the CBA, R.R. at 62a.)

Between May 2001 and July 2002, Broadnax was subjected to an ongoing course of sexual harassment by Mitchell. In one incident, Broadnax was changing clothes in the ladies' room when Mitchell leaned against the door and fell partially into the room. (Arbitrator's op. at 3–4.) On another occasion, while Broadnax was talking to Supervisor Jonas Shour, Mitchell sat down next to Broadnax and threw both arms around her neck. (Arbitrator's op. at 5.) In yet another incident, in May 2002, while Broadnax was alone at the filing cabinet, Mitchell came up behind her and ground his penis into her for approximately fifteen seconds. Broadnax told another warehouse employee what Mitchell had done but did not file a complaint. (Arbitrator's op. at 5, 9.) In addition to these incidents, Mitchell would have his zipper down in the presence of other employees and would "play with himself" when speaking to Broadnax.[4] (Arbitrator's op. at 6.)

On June 28, 2002, Broadnax telephoned Supervisor Joseph Brunetti and asked that Mitchell not be assigned a desk next to hers; Broadnax explained that Mitchell previously had touched her in an "inappropriate manner" but gave no further details.[5] (Arbitrator's op. at 5, 13–15.) Brunetti spoke with Mitchell following the conversation with Broadnax. The following day, after having to break up a shouting match between Broadnax and Mitchell, Brunetti took Mitchell outside and explained what he knew of the alleged touching. Although Mitchell denied any misconduct, Brunetti told Mitchell that "he had to stop touching her—she didn't want to file a complaint." (Arbitrator's op. at 14.) Brunetti believed he had done a "good job" counseling Mitchell, and there would be no more "touching or yelling." However, Brunetti had to break up another loud argument between Mitchell and Broadnax approximately ten days later. Concerned about an "out of control situation," Brunetti reported the incident to his superior, James Forbes, who referred the matter to PHA's Equal Employment Opportunity (EEO) Office. (Arbitrator's op. at 14–15.)

When subsequently questioned by Rosanna Grdinich, PHA's EEO Officer, Broadnax recounted the various incidents of sexual harassment involving Mitchell, and, on July 16, 2002, she filed a formal complaint. (Arbitrator's op. at 5–6, 8.) Broadnax told Grdinich that she did not complain earlier because she thought she could handle the situation on her own, but she decided to contact management when she learned that Mitchell would be sitting next to her. Grdinich investigated Broadnax's allegations and interviewed potential witnesses to the alleged incidents; Grdinich also interviewed Mitchell, who denied most of the allegations. Grdinich con-

---

4. According to witnesses, there was frequent "sexual banter" and "horseplay" in the warehouse. For example, another female co-employee, Linda Bradford, testified that Mitchell once pinched her in the chest area; after that, she and Mitchell engaged in wrestling, he grabbed her and she fell on top of him. Bradford acknowledged that she and Mitchell say things of a sexual nature to each other and that Mitchell probably has asked her "can I eat you out." (Arbitrator's op. at 12–13.) Bradford also stated that Broadnax never participated in this type of behavior, and everyone knew that Broadnax "didn't want to do that kind of stuff." Bradford also confirmed that Broadnax informed her about the incident with Mitchell at the filing cabinet. (Arbitrator's op. at 11–13.)

5. Broadnax testified that, shortly after this conversation, Mitchell asked her if she wanted him to place a fan in the ladies' room so that his "sexy lady wouldn't get sweaty"; Mitchell then told Broadnax that he knew she had spoken to Brunetti and was angry about it. (Arbitrator's op. at 5.)

cluded that Broadnax and the other corroborating witnesses were credible, but Mitchell was not. Based on PHA's zero tolerance Policy concerning sexual harassment, Grdinich recommended that PHA take "immediate administrative action" against Mitchell. (Arbitrator's op. at 18–19.)

PHA ultimately determined that Mitchell should be discharged based on: (1) the pattern of sexual harassment; (2) the unwanted touching; (3) his touching himself; (4) PHA's Policy prohibiting sexual harassment and providing for termination where such harassment took place; and (5) the fact that there was no way to accommodate Mitchell without placing others at risk for sexual harassment. (Arbitrator's op. at 19.)

The Arbitrator found that Mitchell was adequately informed about the prohibition against sexual harassment and that the record contained substantial and convincing evidence that Mitchell engaged in inappropriate sexual behavior directed at Broadnax. The Arbitrator rejected Mitchell's blanket denials of wrongdoing as lacking credibility and found that Mitchell committed the alleged misconduct.[6] (Arbitrator's op. at 32–34.) The Arbitrator stated that, if Broadnax's testimony concerning Mitchell's alleged misconduct is fully credited, then his behavior prior to July 15, 2002, is properly characterized as "lewd, lascivious and extraordinarily perverse." (Arbitrator's op. at 33.) The Arbitrator then specifically concluded that Broadnax told the truth "concerning the

rubbing incident, the hugging incident and [Mitchell's] articulating his desire to engage in sexual acts with her." (Arbitrator's op. at 33–34.)

Despite these findings, the Arbitrator determined that PHA did not establish just cause to terminate Mitchell on October 23, 2002. Stating that the timeline was critical, the Arbitrator emphasized that management at the warehouse knew of and condoned horseplay of a sexual nature, and, prior to Mitchell's discharge, the only action taken in terms of counseling or disciplining him was the June 29, 2002, warning from Brunetti. Although finding that Mitchell was not justified in engaging in his inappropriate sexual misconduct prior to receiving this warning, the Arbitrator concluded that PHA did not present clear and convincing evidence that Mitchell engaged in further acts of sexual harassment after he was warned. (Arbitrator's op. at 35–36.) On this basis, the Arbitrator sustained Mitchell's grievance and awarded a "make whole" remedy, which provided for Mitchell's unconditional reinstatement with back pay. (Arbitrator's op. at 37.)

PHA filed a petition to vacate the Arbitrator's award, which the trial court denied. On further appeal, this court reversed, holding that PHA's legal obligation to protect its employees from sexual harassment in the workplace constituted a "core function" of the agency that PHA could not bargain away,[7] and, therefore, the Arbitrator's award requiring Mitchell's reinstatement was not rationally derived

---

**6.** Before the arbitrator, PHA took the position that it established just cause to terminate Mitchell based on the credible testimony of both Broadnax and Bradford that Mitchell engaged in a pattern of sexually offensive, crude and unwelcome behavior of the type strictly prohibited by law and PHA's Policy. (Arbitrator's op. at 27–29.) On the other hand, the Union took the position that whether there was just cause for Mitchell's termi-

nation depends entirely upon Broadnax's credibility and that, because she was not credible, Mitchell was not discharged for just cause. (Arbitrator's op. at 29–32.)

**7.** Applying what is known as a "core function" analysis, Pennsylvania courts have held that a government employer cannot bargain away its power to fire for misconduct bearing directly upon the performance of its essential

from the CBA and could not be enforced. *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees, District Council 33, Local 934*, 900 A.2d 1043 (Pa.Cmwlth. 2006), *vacated*, 596 Pa. 207, 941 A.2d 1257 (2008) (*Philadelphia Housing I*). The Union petitioned for allowance of appeal, and by order dated January 2, 2008, our supreme court granted the Union's petition, vacated this court's order and remanded with instructions to reconsider PHA's petition to vacate in light of *Westmoreland.*

## II.

In *Westmoreland*, our supreme court reaffirmed that the highly circumscribed "es-

sence test," as articulated in *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999), is the proper standard to be employed by courts in reviewing grievance arbitration awards arising under PERA.[8] However, the court determined that the previously accepted "core function" exception to the essence test was insufficiently precise and prone to unwarranted expansion. Thus, the court abandoned it, adopting instead the public policy exception to the essence test applied in federal courts.[9] *Id.* Specifically, the court stated:

We conclude, however, that the essence test should be subject to a narrow ex-

(i.e., "core") functions, thereby imposing a legal restriction on an arbitrator's interpretation as to what the parties meant by "just cause." *See, e.g., Greene County v. District 2, United Mine Workers of America*, 578 Pa. 347, 361, 852 A.2d 299, 308 (2004); *Office of Attorney General v. Council 13, American Federation of State, County & Municipal Employees, AFL–CIO*, 577 Pa. 257, 844 A.2d 1217 (2004); *City of Easton v. American Federation of State, County, and Municipal Employees, AFL–CIO, Local 447*, 562 Pa. 438, 756 A.2d 1107 (2000); *City of Pittsburgh v. Pittsburgh Joint Collective Bargaining Committee*, 852 A.2d 452 (Pa. Cmwlth.2004).

8. The United States Supreme Court established what has become known as the "essence test" in *United Steelworkers of America v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), when it held that an arbitrator's award is legitimate only so long as it draws its essence from the collective bargaining agreement. Consistent with *Enterprise Wheel and Car* and other federal cases addressing this same subject, Pennsylvania formally adopted the deferential "essence test" over thirty years ago in *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977). More recently in *Cheyney University*, our supreme court set forth a two-pronged approach for application of the essence test: first, the court must determine

whether the issue as properly defined is within the terms of the collective bargaining agreement; and second, if the issue is embraced by the agreement, the court must determine whether the arbitrator's interpretation of the collective bargaining agreement can be rationally derived therefrom. Rejecting review based on reasonableness, the court, in *Cheyney University*, explained that a court does not engage in merit review, but will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement. *Id.*

9. Grounded in the general rule that a court will not enforce a contract that is unlawful or in violation of public policy, the United States Supreme Court has recognized that courts should not enforce an arbitration award that contravenes public policy. *United Paperworkers International Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *W.R. Grace and Company v. Local Union 759, International Union of United Rubber, Cork, Linoleum and Plastic Workers of America*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). As articulated in *W.R. Grace*, a court's refusal to enforce an arbitrator's interpretation of a collective bargaining agreement is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined

483

ception by which an arbitrator's award will be vacated if it is violative of the public policy of the Commonwealth. . . . More specifically, we hold that upon appropriate challenge by a party, a court should not enforce a grievance arbitration award that contravenes public policy. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.

*Westmoreland,* 595 Pa. at 665–66, 939 A.2d at 865–66.

■ It now is well established that there is an explicit, well-defined, and dominant public policy against sexual harassment in the workplace. *See, e.g., Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Stroehmann Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters,* 969 F.2d 1436 (3d Cir.), *cert. denied,* 506 U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992); *Chrysler Motors Corporation v. International Union, Allied Industrial Workers of America, AFL–CIO,* 959 F.2d 685 (7th Cir.) (*Chrysler I*), *cert. denied,* 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA, AFL–CIO,* 915 F.2d 840 (2d Cir.1990), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991). Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e–2. The Equal Employment Opportunity Commission (EEOC), which administers and enforces this provision, has promulgated regulations that define sexual harassment under Title VII and provides that unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment (a form of sex discrimination) when such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. 29 C.F.R. § 1604.11(a).

■ Because Title VII charges employers with the responsibility to maintain a workplace environment free of sexual harassment, there also exists a well-defined, dominant public policy favoring voluntary employer prevention of sexual harassment in the workplace and application of sanctions against those who commit such conduct. *Stroehmann.* EEOC regulations on voluntary employer compliance make employers liable for acts of sexual harassment in the workplace between fellow employees where the employer knew or should have known of the conduct, "unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. § 1604.11(d). In order to eliminate sexual harassment, Employers must take all necessary steps to prevent sexual harassment

and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. 2177 (quoting *Muschany v. United States,* 324 U.S. 49, 65 S.Ct. 442, 89 L.Ed. 744 (1945)). *See also Eastern Associated Coal Corporation v. United Mine Workers of America, District 17,* 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000); *Misco.* The federal public policy exception does not go to the correctness of the underlying merits but only to the legality of the remedy. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision," *Misco,* 484 U.S. at 38, 108 S.Ct. 364; however, a court cannot enforce an arbitration award if the remedy ordered by the arbitrator requires the employer or the union to take some action that would violate the law or be against clear public policy. *W.R. Grace.* The question of public policy is ultimately one for resolution by the courts. *Id.*

from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned. 29 C.F.R. § 1604.11(f).

■ In addition, the EEOC has issued policy guidance with regard to preventative and remedial action, which further provides that an employer should create and effectively implement an explicit policy against sexual harassment that encourages alleged sexual harassment victims to come forward and includes a procedure for resolving sexual harassment complaints. The EEOC reminds employers that, under Title VII, they have an affirmative duty to eradicate hostile or offensive work environments, and, therefore, Title VII obligates employers to investigate complaints of sexual harassment and deal appropriately with the offending personnel. EEOC advises that when an employer receives a complaint, or otherwise learns of sexual harassment in the workplace, the employer should investigate promptly and thoroughly, then take appropriate corrective action by doing whatever is necessary to end the harassment, make the victim whole and prevent the misconduct from recurring. EEOC notes that, while a range of disciplinary actions may be necessary, generally, the corrective action should reflect the severity of the conduct. *EEOC Policy*

*Guidance on Current Issues of Sexual Harassment.*[10]

■ Pennsylvania has similar legislation and rules.[11] Section 5(a) of the Pennsylvania Human Relations Act (PHRA)[12] also prohibits discrimination on the basis of sex and has been interpreted to include sexual harassment that is severe or pervasive enough to create a hostile work environment. 43 P.S. § 955(a). Moreover, pursuant to its statutory authority to adopt rules and regulations to effectuate the policies and provisions of the PHRA, the Pennsylvania Human Relations Commission has adopted guidelines on sexual harassment that are very similar to those promulgated by the EEOC.

### III.

In the context of arbitration, federal decisions addressing the public policy against sexual harassment in the workplace have focused on an employer's obligation, as set forth in these various laws and regulations, to provide a safe work environment by eliminating such conduct. In *Stroehmann,* the employer discharged an employee after investigating a report that he sexually harassed a customer. Without deciding the merits of the charge, the arbitrator ordered the employee's reinstatement without back pay, concluding that the employer failed to investigate sufficiently and, thus, did not give the employee a· full opportunity to refute the charge before

**10.** EEOC Policy Guidance is found in EEOC Notice N–915–050, dated March 19, 1990, available at http://www.eeoc.gov/policy/docs/currentissues.html. As an administrative interpretation of Title VII, EEOC guidelines, while not controlling, constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. *Meritor.*

**11.** Philadelphia also has a local law that prohibits employers from discriminating on the

basis of sex in employment. Section 9–1103(A)(1) of the Philadelphia Code.

**12.** Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. § 955(a). In deciding sexual harassment cases under the PHRA, Pennsylvania courts look to federal court decisions interpreting Title VII. *Hoy v. Angelone,* 456 Pa.Super. 596, 691 A.2d 476 (1997), *aff'd,* 554 Pa. 134, 720 A.2d 745 (1998).

terminating him. On appeal, the district court vacated the award, holding that an award reinstating an employee accused of sexual harassment without a determination that the harassment did not occur violates the well-established public policy in favor of employer sanctions against employees who commit sexual harassment. The Third Circuit affirmed, noting that such an award would allow a person who may have committed sexual harassment to continue in the workplace. The court stated, "Certainly, it does not discourage sexual harassment. Instead, it undermines the employer's ability to fulfill its obligation to prevent and sanction sexual harassment in the workplace. For these reasons, we conclude that reinstatement of this employee without a determination of the merits of the allegation violates public policy." *Stroehmann*, 969 F.2d at 1442.

In *Newsday*, the employer discharged an employee for sexually harassing female co-workers. Although the arbitrator found that the employee had committed sexual harassment more than once, the arbitrator concluded that progressive discipline was called for and that discharge was too strong a sanction; the arbitrator reinstated the employee, but without back pay. The district court vacated the award and the Second Circuit affirmed, reasoning that the award violated public policy because it returned a known sexual harasser to the workplace, thereby perpetuating a hostile and offensive work environment and inhibiting the employer from carrying

out its legal obligation to eliminate such conduct. *Newsday*.

In cases where courts have upheld arbitrators' awards reinstating employees who have committed sexual harassment, there still has been some significant sanction against the offending employee. In *Chrysler I*, the employer discharged an employee for sexually assaulting a co-worker. Before the arbitrator, the employer presented evidence of four additional incidents of sexual misconduct, discovered after the employee was terminated. However, the arbitrator refused to consider anything other than the single incident upon which the discharge was based and concluded that severe discipline short of discharge would be adequate to deter him from further misconduct and demonstrate the employer's opposition to sexual misconduct. Thus, the arbitrator reduced the penalty to a thirty-day suspension and directed reinstatement with back pay. The Seventh Circuit upheld the award, noting that the arbitrator had considered that, under the circumstances, a modified discipline would be adequate to deter further misconduct.[13]

In *Communication Workers of America v. Southeastern Electric Cooperative of Durant, Oklahoma*, 882 F.2d 467 (10th Cir.1989), the employer discharged an employee after a customer reported that he had sexually harassed her. In modifying the discipline imposed, the arbitrator recognized this as a one-time offense and noted the employee's otherwise unblemished record and his penitent and apologetic attitude.[14] The arbitrator concluded

**13.** Based on the award that was affirmed in *Chrysler I*, the employer rehired the employee and then, almost simultaneously, fired him for the four additional instances of sexual harassment uncovered while the employer was preparing for the first arbitration. The Seventh Circuit upheld the employer's action. Holding that an employer is not forever foreclosed from using evidence acquired after an initial discipline as a basis for a subsequent termi-

nation, the court noted that, because the arbitrator had treated the case as involving only a single incident of sexual harassment, the employer now had "fresh evidence" upon which to base its second discharge. *Chrysler Motors Corporation v. International Union, Allied Industrial Workers of America, AFL–CIO*, 2 F.3d 760 (7th Cir.1993) (*Chrysler II* ).

**14.** In contrast, here, Mitchell denied that he had acted inappropriately, and his refusal to

that the single offense, albeit serious, should not lead to discharge and that a one-month suspension without pay was commensurate with the improper conduct. The Tenth Circuit upheld the award, expressly noting that the arbitrator imposed corrective discipline and had fully incorporated the important public policy against sexual harassment into his reasoning.[15]

## IV.

As observed in *Eastern Associated Coal Corporation v. United Mine Workers of America, District 17*, 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000), an arbitrator exercises powers delegated from the parties. Both PHA and the Union have bargained for the Arbitrator's construction of the CBA, and they have granted him the authority to interpret the meaning of its language, including the term "just cause." The arbitrator acts on the parties' joint behalf, and the resulting award is effectively the parties' joint decision, to be treated as if it represented an agreement between the parties themselves; there is no distinction between the award and the contractual agreement. *Id.* Consequently, in considering the issue before us, we must assume that the CBA itself calls for the remedy set forth in the

Arbitrator's award; the question to be asked is does a CBA requirement to reinstate Mitchell without conditions and make him whole run counter to the identified public policy against sexual harassment in the workplace. *See id.* In light of the cases discussed above, we conclude that the Arbitrator's interpretation of the CBA so undermines the stated public policy that it cannot be enforced.

The Arbitrator here found that Mitchell repeatedly and egregiously sexually harassed Broadnax by engaging in behavior that the Arbitrator described as lewd, lascivious and extraordinarily perverse. Nevertheless, the Arbitrator ordered PHA to reinstate Mitchell with back pay, reasoning that Brunetti's counseling/warning on June 29, 2002, put an end to the sexual harassment and, thus, adequately and effectively addressed Mitchell's conduct.[16] However, PHA's Policy directs those who are aware of incidents of sexual harassment to bring the matter to the attention of their general manager or to PHA's EEO Officer so that investigation and corrective action might be undertaken. (R.R. at 99a.) Brunetti, a low-level warehouse supervisor, did not sanction or reprimand Mitchell in accordance with that Policy; he merely directed Mitchell to stop touching

---

acknowledge the wrongfulness of his conduct provides no indication that Mitchell would cease his harassing activities. In fact, as noted by the Arbitrator, one of the stated reasons for PHA's selection of discharge as the appropriate sanction against Mitchell was the fact that there was no way to accommodate Mitchell without placing others at risk for sexual harassment.

15. *See also Weber Aircraft, Inc. v. General Warehousemen and Helpers Union Local 767*, 253 F.3d 821 (5th Cir.2001) (awarding reinstatement but imposing an eleven-month suspension without back pay); *Westvaco Corporation v. United Paperworkers International Union, AFL–CIO, ex rel. Local Union 676*, 171 F.3d 971 (4th Cir.1999) (awarding reinstate-

ment but imposing a nine-month suspension without back pay); *Jamaica Buses, Inc. v. Transport Workers' Union, AFL–CIO, Local 100*, 2003 WL 1621026 (E.D.N.Y.2003) (awarding reinstatement following a single infraction upon condition that any future misdeeds would lead to immediate discharge).

16. The Arbitrator also noted that PHA knew of and condoned horseplay of a sexual nature in the workplace. It is evident that when sexually charged innuendo contaminates a workplace and creates an abusive environment, Title VII is violated. Assuming that PHA had created a safe haven for such conduct, the Arbitrator's award acts to perpetuate, rather than remedy, that situation.

Broadnax or risk her filing a complaint. Most important, at the time, Brunetti was unaware of the nature and extent of Mitchell's behavior, which did not come to light until PHA's EEO Officer completed an investigation of Broadnax's complaint.[17]

Because Title VII is designed to encourage the creation of anti-harassment policies and effective complaint mechanisms for reporting harassing conduct, an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking under federal law, and appropriate corrective action is required *following* such investigation. *Mulvihill v. Top–Flite Golf Company*, 335 F.3d 15 (1st Cir.2003). By ordering reinstatement on the basis of Brunetti's pre-investigation "warning," the Arbitrator effectively precludes PHA from following its Policy and thereby satisfying its legal obligations to protect against sexual harassment in the workplace. If forced to honor the arbitration award, PHA will not be complying with Title VII and the PHRA, each of which requires that an employer impose appropriate discipline for proven cases of sexual harassment in order to ensure a safe work environment free of sexual harassment.

Although the Union correctly states that the law does not require termination of employees in every case of sexual harassment, the concept of just cause demands a close, albeit not exact, correlation between the employee's conduct and the employer's response. Here, the Arbitrator essentially interpreted the CBA as requiring unconditional reinstatement of an employee who committed numerous acts of sexual harassment. To find substantial evidence supporting some type of disciplinary action for Title VII purposes but not for purposes of a "just cause" provision in the CBA would frustrate the important, well-established public policy against sexual harassment in the workplace.[18] Thus, in accordance with *Stroehmann* and the other federal decisions discussed herein, we hold that such an award cannot be enforced.[19]

For the foregoing reasons, we reverse.[20]

## ORDER

AND NOW, this 15th day of September, 2008, the order of the Court of Common

---

**17.** Indeed, an employer can take appropriate disciplinary action only when it has sufficient information and evidence to support such action. The CBA requires just cause for disciplinary action, and just cause does not exist without proof.

**18.** As we observed in our prior opinion in this same case, "If an agency of the Commonwealth entered into an agreement, which expressly excluded conduct by an employee, of the nature herein, from the definition of "just cause" for discharging that employee, its validity would at best be questionable." *Philadelphia Housing I*, 900 A.2d at 1048 (quoting *Pennsylvania Liquor Control Board v. Independent State Stores Union*, 520 Pa. 266, 276, 553 A.2d 948, 953 (1989)).

**19.** This determination is entirely consistent with our review of relevant case law. In cases where, as here, the arbitrator found that the discharged employee committed the sexual harassment for which he was terminated, any decision to reinstate the offending employee has always included imposition of some discipline designed to deter future offending conduct. However, in this case, the Arbitrator's award simply removed the discharge imposed by PHA without substituting a lesser penalty in its place.

**20.** In reaching this result, we do not exceed our narrow power to review an arbitrator's findings of fact or his interpretation of the meaning of this CBA's provisions. Moreover, we do not substitute judicial opinion for the Arbitrator's decision in contravention of the parties' CBA. We do not rule on either the merits of the allegations or impose the remedy we feel is appropriate. Instead, we simply vacate the award as violative of public policy.

Pleas of Philadelphia County, dated September 22, 2004, is hereby reversed.

## DISSENTING OPINION BY Judge SMITH–RIBNER.

I write separately to state my view that although the Supreme Court in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 595 Pa. 648, 939 A.2d 855 (2007), abandoned the "core functions" exception in favor of the newly adopted federal public policy exception to the "essence test" standard of review of arbitrators' awards, the essence test standard is still valid and reliable and remains the most lucid and precise standard by which the award in the case *sub judice* should be reviewed. The Supreme Court recognized that the core functions test analyzed in *City of Easton v. AFSCME, Local 447*, 562 Pa. 438, 756 A.2d 1107 (2000), had created uncertainty and criticism in the area of labor arbitration and that the test was insufficiently precise. As a consequence, the court discarded the core functions test and replaced it with the federal public policy exception to be applied as well to awards under the Public Employe Relations Act (PERA).

Justice Castille (now Chief Justice) pointed out in his dissent that the parties did not advocate the public policy exception, which the Supreme Court adopted *sua sponte;* that the plurality's new standard created unnecessary delay in resolving the matter before the Supreme Court; and that the plurality adopted the public policy exception in a vacuum, which fails to offer lower courts sufficient guidance, resulting in more uncertainty and generating more litigation in an area where certainty and predictability is critical. My concern with today's decision by the majority in the case *sub judice* is that it will do just what

Justice Castille has warned. The majority's application of the public policy exception to reverse the trial court's order here will generate more confusion, more uncertainty and less predictability in resolving these types of cases under PERA. Notwithstanding my full agreement with the majority that all workplaces must be free of sexual harassment, I must adhere to the view that the employers, union employees, arbitrators and the bar are entitled to a reasonable degree of stability and certainty in the area of labor arbitration jurisprudence and are entitled to know that labor disputes will be resolved consistently with legislative mandates.

The Supreme Court in *Westmoreland Intermediate Unit # 7* again reaffirmed the essence test as articulated in *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999). In *Cheyney University* the Supreme Court articulated a precise two-part analysis for judicial review of arbitration awards, called the essence test: first, courts must determine if the issue as properly defined is within terms of the collective bargaining agreement; and, second, if the issue is so embraced by the agreement and thereby properly before the arbitrator, then the arbitrator's award is to be upheld if his/her interpretation can rationally be derived from the agreement. In other words, a court will vacate an arbitration award only when it "indisputably and genuinely" lacks foundation in or fails to logically flow from the parties' agreement. *Id.* at 150, 743 A.2d at 413.

The essence test standard is clear, it has been the proper standard for judicial review for thirty years as observed in *Westmoreland Intermediate Unit # 7*, and it promotes legislative mandates for the final and binding resolution of labor disputes in

this Commonwealth. This standard, if properly applied to the Court's reconsideration of the appeal in the case *sub judice*, would result in affirming the trial court's order. The issue before the arbitrator was whether the Philadelphia Housing Authority had just cause to terminate Thomas Mitchell, the warehouse employee who was discharged for sexually harassing another employee. Article VIII of the collective bargaining agreement provided that no disciplinary action or discharge would be imposed upon an employee without just cause, except insofar as it related to dismissal during the probationary period for new hires. The arbitrator determined that the prior discipline of Mitchell sufficiently dealt with his actions, which ended subsequent to the discipline, and therefore that the Housing Authority could not terminate him. The arbitrator concluded that no just cause existed for the discharge and ordered that Mitchell be reinstated. The trial court held that the award was rational and could not be seen as one that failed to flow logically from the collective bargaining agreement. *See Cheyney University.*

In adopting the public policy exception in *Westmoreland Intermediate Unit # 7* the Supreme Court held that on appropriate challenge by a party, "a court should not enforce a grievance arbitration award that contravenes public policy. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* at 666, 939 A.2d at 865–866. In response to the court's adoption of the exception, Justice Castille proposed that a "manifestly unreasonable" review standard would be less unwieldy than the new public policy exception and that it would accomplish the same result, while also striking a balance between deference due arbitration awards and meaningful judicial review. Justice Eakin joined in Justice Castille's

dissent as he too disagreed with *sua sponte* implementation of the public policy exception, and Justice Saylor concurred in the result reached by the plurality as he believed that the circumstances met a narrow exception to the requirement of adherence to *stare decisis* and as he did not object to a public policy exception to essence test review so long as the exception was "exceptionally narrow."

Regardless of the concerns expressed about the uncertainty created in this area of the law, I stress that the Supreme Court's remand order did not direct this Court to apply the newly-adopted public policy exception in *Westmoreland Intermediate Unit # 7*. I also note that plurality opinions may be considered for their persuasive value and that they are not precedential. *Piunti v. Department of Labor and Industry, Unemployment Compensation Board of Review*, 933 A.2d 135 (Pa. Cmwlth.2007). Even if the public policy exception applied here, I agree with the view expressed by Judge Pellegrini in his dissent that the majority has improperly expanded the exception by holding that public policy requires the automatic discharge of the employee here. Nonetheless, the Supreme Court was emphatic in reaffirming the essence test standard of review articulated in *Cheyney University*, and that test, if properly applied, commands that the trial court's order be affirmed. I therefore dissent.

Judge McGINLEY joins in this dissenting opinion.

## DISSENTING OPINION BY Judge PELLEGRINI.

"This is like déjà vu all over again." In my original dissent in this appeal, *Philadelphia Housing Authority v. American Federation of State, County and Mun. Employees, Dist. Council 33, Local 934,*

900 A.2d 1043 (Pa.Cmwlth.2006) (Philadelphia Housing I), I dissented because the majority impermissibly expanded the then extant "core function" exception to the essence test to conduct what was not covered by that exception. On remand, even though the test has now been changed to the federal "public policy exception" by our Supreme Court, I believe the majority also impermissibly expands that standard by focusing on whether the conduct is against public policy, not on whether the outcome of the award is against public policy. Under that standard, while there is public policy against sexual harassment, there is no public policy that every harasser must be fired; therefore, I would affirm the trial court. Moreover, if that standard applies here, the majority does not order a remand to order a remedy not in conflict with a federal public policy. And, as in my original dissent, I again humbly urge our Supreme Court to supplant the federal court-created essence test applicable to private sector arbitration by adopting the judgment n.o.v. test, the prescribed statutory standard set forth in the Uniform Arbitration Act of 1980(UAA) to review public sector arbitration awards.

## I.

Courts review all public sector labor awards in Pennsylvania under the "essence test," which has been explained as follows:

[A] reviewing court will apply a two-prong analysis. First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*State System of Higher Education (Cheyney University) v. State College and University Professional Association (PSEA–NEA),* 560 Pa. 135, 150, 743 A.2d 405, 413 (1999). The essence test, then, is not a test that delves into the merits of the dispute or examines the propriety of the outcome, but is one that examines whether the arbitrator had jurisdiction to consider the matter—a deference test.

As I stated in my original dissent, because the essence test is so highly deferential, our Supreme Court and this Court have been struggling for years with how to review arbitration cases under the essence test where the arbitrator's award condones conduct that in some way does not make sense in the public sector context. The courts have gone through various iterations of formulations to address that concern, all as exceptions to the essence test. The first was the "manifestly unreasonable" exception to the essence test which allowed courts to reverse an arbitrator's award if the conduct engaged was so egregious—that the conduct was either criminal or akin to a breach of a fiduciary duty and such an award was considered irrational and manifestly unreasonable and could be set aside. The "manifestly unreasonable" test was repudiated in *Cheyney* which held that a standard based upon reasonableness ("reasonable interpretation" and "manifestly unreasonable") was inappropriate to uphold the policy goals of binding arbitration. Our Supreme Court stated that "[a] mere reasonableness standard encourages a reviewing court to assert its own brand of labor relations philosophy. It emboldens a court to become a 'superarbitrator' and to vacate an award when it finds that the award is at odds

with how the members of the court would have decided the case." *Cheyney*, 560 Pa. at 149, 743 A.2d at 413.

Just after the manifestly unreasonable standard was abolished in *Cheyney*, in *City of Easton v. American Federation of State, County and Municipal Employees, AFL–CIO, Local 447*, 562 Pa. 438, 756 A.2d 1107 (2000), a new public policy exception was adopted, later named in *Greene County v. District 2, United Mine Workers of America*, 578 Pa. 347, 852 A.2d 299 (2004), as the "core function" exception. Under that standard, we interpreted in our original decision the issue on appeal as "whether the misconduct at issue interferes with the public employer's 'control over its enterprise' or impedes the public employer's powers, which are essential to its ability to accomplish its functions. In other words, if the employee's misconduct interferes with the public employer's ability to ensure proper operation of its organization, then it cannot bargain away the ability to terminate an employee for such misconduct." *Philadelphia Housing Authority*, 900 A.2d at 1051.

Acknowledging that the core function exception has been met "with uncertainty and criticism," in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association*, 595 Pa. 648, 939 A.2d 855 (2007), our Supreme Court replaced the "core function" exception with the federal public policy exception to the essence test. Because it was not raised by any of the parties in that case, the Court did not explain what the test was or any parameters to be used in applying it, instead remanding that case and others, including this case, to apply and articulate the standard.

## II.

The Supreme Court of the United States has addressed the extent and application of the public policy exception in the enforcement of arbitration awards, each time applying it narrowly and, in that narrow context, determining whether the remedy directly violated public policy. The first case in which the United States Supreme Court addressed the "public policy exception" was *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), which involved an employee who had been denied a promotion contrary to seniority provisions in the collective bargaining agreement (CBA) because a private employer had failed to comply with a conciliation agreement that W.R. Grace had entered into with the Equal Employment Opportunity Commission (EEOC) to settle claims of discrimination under Title VII of the Civil Rights Act. The employee grieved the denial of promotion, and the arbitrator, finding that the denial of the promotion was in contravention of the CBA, ordered the employee to be promoted. On appeal, the employer argued that the award contravened the public policy against discrimination and should not be enforced.

The Supreme Court first concluded that the threshold question of whether a public policy existed was ultimately to be determined by the courts. The Court indicated that a public policy could only be said to exist if it was "well defined" and "dominant" and had to be ascertained by "reference to the laws and legal precedents and not from general considerations of supposed public interests." 461 U.S. at 766, 103 S.Ct. 2177. The Court identified two important public policies that were potentially jeopardized by the arbitration award: obedience to judicial orders and compliance with Title VII of the Civil Rights Act. After identifying those policies, the Court held that the enforcement of the award would not compromise either of the public

policies identified because promotions were governed by collective bargaining and nothing required placing the burden to remedy discrimination on male employees who were not responsible for the discrimination.

The Court again addressed the public policy exception in *United Paperworkers International Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). In that case, a machine operator was discovered alone in the backseat of a car parked in the company's parking lot with a marijuana cigarette burning in the ash tray in the car's front seat. The employer discharged the worker for using drugs on company property, but that worker was later reinstated by the arbitrator (in either his former position or another for which he was qualified) because the arbitrator found that the employer lacked "just cause" for his dismissal. The employer appealed, arguing that reinstatement violated public policy because it would allow a drug-impaired individual to operate a dangerous piece of machinery.

Upholding the arbitrator's decision, the Supreme Court rejected the formulation of a public policy against the operation of dangerous machinery while under the influence of drugs, stating that while "such a judgment is firmly rooted in common sense, ... a formulation of public policy based only on 'general considerations of supposed public interests' is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement." *Id.*, 484 U.S. at 44, 108 S.Ct. 364. The Supreme Court further stated that while its decision in *W.R. Grace* allowed for a public policy exception to the enforcement of an arbitration award, that decision did not "sanction a broad judicial power to set aside arbitration awards as against public policy." *Id.*, 484 U.S. at 43,

108 S.Ct. 364. The Court clarified that its holding in *W.R. Grace* turned on whether the award caused a conflict with other laws and legal precedents and did not depend on general considerations of supposed public interests. It also stated that a review did not permit a court to interject its inferences as to the facts as found by the arbitrator because the parties had never bargained for the facts to be found by a court, but rather by the arbitrator chosen by the parties.

Because the federal circuits were taking an expansive view of the public policy exception, such as in *Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436 (3d Cir.1992), and *Newsday, Inc. v. Long Island Typographical Union*, 915 F.2d 840 (2d Cir.1990), in *Eastern Associated Coal Corp. v. Mine Workers of America, District 17*, 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000), the Court made clear that a public policy exception was extremely narrow and went to the legality of the remedy. That case involved a truck driver who had tested positive twice in random drug tests conducted pursuant to Department of Transportation regulations. After the employee was discharged, the arbitrator ordered his reinstatement with the conditions that he serve a three-month suspension, reimburse the company and the union for the cost of arbitration and participate in a drug rehabilitation program and submit to random drug testing. On appeal, Eastern Associated argued that reinstating a truck driver who tested positive for drugs violated public policy. It cited the federal Omnibus Transportation Employee Testing Act of 1991 and the Department of Transportation's regulations to support its position. The Court was unpersuaded.

Reiterating its earlier holdings, the Court first explained that parties to a CBA had bargained for the arbitrator's inter-

pretation of what the agreement meant, and the fact that a court might be convinced that the arbitrator had committed a serious error did not suffice to overturn the decision. In examining the facts of the *Eastern Associated* case, the Court stressed that in applying the public policy exception, the question was not whether the employee's drug use itself violated public policy—the focus had to be on whether the agreement to reinstate the employee violated public policy.[1]

Under such a narrow focus, the Court found that the award violated no specific provision of any law or regulation—it did require rehabilitation for the employee and did not prevent the employer from reassigning him to a non-safety sensitive position until the treatment program was completed. The Court also noted that even though the employee had failed a drug test previously, it was improper to punish the employee more severely for his second lapse when all the Department of Transportation's regulations required was a driving prohibition period for a controlled substances violation, the completion of rehabilitation requirements, and a test with a negative result before a return-to-duty was appropriate. While the Court admitted that reasonable people could certainly differ as to whether discharge was the more appropriate remedy, ultimately, the parties had agreed to entrust the decision to an arbitrator, and the Court could not find any explicit, well-defined and dominant public policy that was violated by the award.

Under the federal public policy exception, then, for a court to refuse to enforce an arbitration award, the remedy that the

arbitrator orders must require the employer or the union to take some other action that would violate the law or be against clear public policy. However, if the award simply does not punish an illegal act, it does not fall within the exception and a federal court would enforce the award. This exception does not go to the correctness of the resolution of the underlying merits, to which the federal courts still defer, but only to the legality of the remedy. *See Philadelphia Housing Authority v. American Federation of State, County and Mun. Employees, Dist. Council 47, Local 2187, AFL–CIO*, 945 A.2d 796 (Pa. Cmwlth.2008).

After *Eastern Associated,* the federal public policy exception application to sexual harassment was addressed in *Weber Aircraft, Inc. v. General Warehousemen and Helpers Union Local 767*, 253 F.3d 821, 823 (Fifth Cir.2001). In that case, a grievant was accused of sexually harassing a female co-worker, and during the investigation of the complaint, two additional female co-workers also accused the grievant of sexually harassing them. Based on its investigation, the employer discharged the grievant, and his union sought arbitration seeking reinstatement with backpay. The arbitrator found that the grievant's conduct constituted sexual harassment, but was not just cause for termination and ordered that he be reinstated but without backpay. In reversing the District Court's vacating of the arbitration award, after reviewing Supreme Court precedent set forth above, the Fifth Circuit stated:

> The question to be answered is not whether [grievant's] sexual harassment of female co-workers itself violates pub-

---

1. Specifically, the Court stated that the question must be "does a contractual agreement to reinstate Smith with specified conditions ... run contrary to an explicit, well-defined and dominant public policy, as ascertained by

reference to positive law and not from general considerations of supposed public interest?" *Eastern Associated,* 531 U.S. at 63, 121 S.Ct. 462.

lic policy, but whether the CBA, which (as interpreted by the arbitrator) provides for his reinstatement, does so. *See id.* "To put the question more specifically, does a [collective bargaining] agreement to reinstate [a discharged employee] with specified conditions . . . run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?" [*Eastern Assoc. Coal* ] (citing *Misco*, 484 U.S. at 43, 108 S.Ct. 364, 98 L.Ed.2d 286.)

The Supreme Court, in *Eastern Associated Coal Corp. v. Mine Workers*, "agree[d], in principle, that courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law." 121 S.Ct. at 467. "Nevertheless, the public policy exception is narrow and must satisfy the principles set forth in *W.R. Grace* and *Misco*." [FN2] *Id.;* see also *Id.*, 121 S.Ct. at 470 (Scalia, J., concurring) ("It is hard to imagine how an arbitration award could violate a public policy, identified in this fashion, without actually conflicting with positive law.").

Applying the foregoing precepts, we, like the Supreme Court in *Eastern Associated Coal Corp.*, "cannot find in the [laws], the regulations, or any other law or legal precedent an 'explicit,' 'well defined,' 'dominant' public policy to which the arbitrator's decision 'runs contrary.' " *Id.* at 469 (quoting *Misco*, 484 U.S. at 43, 108 S.Ct. 364, 98 L.Ed.2d 286; *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. 2177, 76 L.Ed.2d 298).[FN3] We conclude, therefore, that Weber's public policy claim must be rejected.

At footnote 3 of that opinion, the Fifth Circuit reviews other Circuits' application of the federal public policy exception to harassment, including the federal cases relied upon by the majority, stating:

> Our conclusion is in accord with the decisions of the other Circuits that have addressed the issue of whether there is a clear public policy against reinstating sexual harassers. *See Westvaco Corp. v. United Paperworkers Int'l Union*, 171 F.3d 971, 977 (4th Cir.1999); *Communication Workers v. S.E. Elec. Co-op.*, 882 F.2d 467 (10th Cir.1989); *Chrysler Motors Corp. v. Allied Indus. Workers*, 959 F.2d 685 (7th Cir.1992). In *Westvaco Corp. v. United Paperworkers International Union*, the Fourth Circuit noted that "while it is certainly true that there is a public policy against sexual harassment, . . . [t]here is no public policy that every harasser must be fired. Instead, a company must 'exercise [ ] reasonable care to prevent and correct promptly any sexually harassing behavior.' " 171 F.3d at 977 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). The Fourth Circuit reasoned that, "because misconduct often differs in degree, there is no universal punishment that fits every case." *Id.* Decisions in the Seventh and Tenth circuits support the conclusion of the *Westvaco* court. *See Chrysler Motors Corp.*, 959 F.2d at 687–88 (finding that a less severe punishment than discharge was an appropriate alternative remedy for a sexual harasser and did not violate public policy); *S.E. Elec. Co-op.*, 882 F.2d at 469 (examining an arbitrator's reinstatement award and finding that it did not violate public policy against sexual harassment).

The Fifth Circuit then went on to address the cases relied on by the majority, *Newsday* and *Stroehmann*, stating:

> Contrary to [employer's] argument, the Second and Third circuits have not squarely addressed the issue. In *News-*

*day, Inc. v. Long Island Typographical Union,* 915 F.2d 840 (2d Cir.1990), the Second Circuit determined that there is a clear public policy in favor of eliminating sexual harassment from the workplace. However, the court came to no conclusion as to whether there is a clear public policy against reinstatement of sexual harassers who have been otherwise sanctioned for their behavior. Rather, in light of the fact that the employee in that case had been disciplined for previous acts of sexual harassment and informed that further sexual harassment would lead to his discharge, the Second Circuit found that the public policy in favor of eliminating sexual harassment from the workplace justified vacating the arbitrator's award reinstating the employee in that particular case. *See St. Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199,* 116 F.3d 41, 47 (2d Cir.1997) (noting the limited scope of *Newsday's* holding). In *Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters,* 969 F.2d 1436 (3d Cir.1992), the Third Circuit found that there is a clear public policy in favor of employer sanctions against employees who commit sexual harassment. *Id.* at 1442. Because the arbitrator there awarded full reinstatement to the employee without determining whether harassment occurred, the court found that the reinstatement violated the public policy in favor of sanctioning sexual harassers. *Id.* However, the court did not reach the question of whether a clear public policy required discharge as the only appropriate sanction. In fact,

the *Stroehmann* court recognized that when an arbitrator addressed the merits of the sexual harassment claims against the discharged employee and then made the determination that a sanction less severe than discharge was the appropriate remedy, the arbitrator would not violate public policy by reinstating a sexual harasser without backpay. *Id.* at 1443.

In the present case, the arbitrator found Grievant repeatedly sexually harassed a female co-worker, but found two circumstances mitigated against Grievant's termination. First, management at the central warehouse facility was aware of and condoned horseplay of a sexual nature. Second, after Grievant received a verbal warning from one of the Authority's lower-level supervisors, his sexually harassing misconduct ceased.[2] Applying the exception to this case, the remedy here does not require Employer to violate any public policy by reinstating him. Because there is no public policy that every person must be fired, I dissent.

Even if the majority application of the federal public policy exception was correct, I would still dissent because the majority vacates the arbitration award and reinstates the dismissal. Under the federal public policy exception, even if the federal public policy exception is violated, the remedy is not to reinstate the employer's discipline but to remand to the arbitrator to fashion an award—a remedy that would not violate or advance public policy. In *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 510–511, 121 S.Ct.

**2.** Grievant was warned about his inappropriate conduct on June 29, 2002. Shortly thereafter, the Authority undertook a formal investigation into the sexual harassment charges against Grievant. During the investigation, the Authority allowed Grievant to continue to work in the central warehouse facility. Fol-

lowing the completion of the investigation on October 23, 2002, the Authority fired Grievant. The arbitrator determined that between the time he was warned and the date of his termination, Grievant worked without any reported incidents of sexual misconduct.

1724, 149 L.Ed.2d 740 (2001), the Supreme Court stated:

> But again, established law ordinarily precludes a court from resolving the merits of the parties' dispute on the basis of its own factual determinations, no matter how erroneous the arbitrator's decision. *Misco, supra,* at 40, n. 10, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286; see also *American Mfg. Co., supra,* at 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403. Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings. *Misco, supra,* at 40, n. 10, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286. The dissent suggests that the remedy described in *Misco* is limited to cases where the arbitrator's errors are procedural. *Post* this page and 1730 (opinion of STEVENS, J.). *Misco* did involve procedural issues, but our discussion regarding the appropriate remedy was not so limited. If a remand is appropriate *even* when the arbitrator's award has been set aside for "procedural aberrations" that constitute "affirmative misconduct," it follows that a remand ordinarily will be appropriate when the arbitrator simply made factual findings that the reviewing court perceives as "irrational." The Court of Appeals usurped the arbitrator's role by resolving the dispute and barring further proceedings, a result at odds with this governing law.

### III.

In my dissent in *Philadelphia I,* I humbly suggested that the "essence test" tak-

en from federal labor law involving the enforcement of private sector collective bargaining in federal courts is simply inapplicable in public sector labor relations. I pointed out that arbitration of grievances, unlike in Pennsylvania,[3] was not required by federal law, but was only required if contractually provided. The essence test was an affirmative defense to an action for specific performance of an arbitration award, while in Pennsylvania, it is the scope of review of an appeal limiting what the court may review. Most important, the "essence test" is not the scope of review mandated by the General Assembly in the UAA to review public sector labor arbitrations. Because I suggested replacing the existing regime of reviewing public sector arbitration awards, I explained how that scope of review came to be. Rather than repeating it here, I will only reiterate the analysis urging the adoptions of the UAA standard. I reasoned:

> If the 'essence test' is not the proper scope of review, then what is? This is the easiest part of the analysis because the General Assembly has statutorily provided one—The Uniform Arbitration Act of 1980(UAA). 42 Pa.C.S. §§ 7301–7362. The UAA explicitly sets forth the scope of judicial review of public sector agreements, including grievance-arbitration under collective bargaining agreements entered pursuant to PERA. 42 Pa.C.S. § 7302 provides how the UAA is to apply to all arbitrations that are entered into by a governmental agency. Quoted in full, it provides:

---

**3.** 43 P.S. § 1101.903 of the Public Employe Relations Act provides: "Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory. The procedure to be adopted is a proper subject of bargaining with the proviso that the final

step shall provide for a binding decision by an arbitrator or a tri-partite board of arbitrators as the parties may agree. Any decisions of the arbitrator or arbitrators requiring legislation will only be effective if such legislation is enacted ..."

§ 7302. Scope of subchapter

(a) General rule.—An agreement to arbitrate a controversy on a nonjudicial basis shall be conclusively presumed to be an agreement to arbitrate pursuant to Subchapter B (relating to common law arbitration) unless the agreement to arbitrate is in writing and expressly provides for arbitration pursuant to this subchapter or any other similar statute, in which case the arbitration shall be governed by this subchapter.

(b) Collective bargaining agreements.—This subchapter shall apply to a collective bargaining agreement to arbitrate controversies between employers and employees or their respective representatives only where the arbitration pursuant to this subchapter is consistent with any statute regulating labor and management relations.

(c) Government contracts.—This subchapter shall apply to any written contract to which a government unit of this Commonwealth is a party to the same extent as if the government unit were a private person, except that where a contract to which the Commonwealth government is a party provides for arbitration of controversies but does not provide for arbitration pursuant to any specified statutory provision, the arbitration shall be governed by this subchapter.

(d) Special application.—

(1) Paragraph (2) shall be applicable where:

(i) The Commonwealth government submits a controversy to arbitration.

(ii) A political subdivision submits a controversy with an employee or a representative of employees to arbitration.

(iii) Any person has been required by law to submit or to agree to submit a controversy to arbitration pursuant to this subchapter.

(2) Where this paragraph is applicable a court in reviewing an arbitration award pursuant to this subchapter shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict.

As can be seen, 42 Pa.C.S. § 7302(c), in essence, provides that the statutory arbitration standard set forth in the UAA should apply to any written contract to which a governmental unit is a party. 42 Pa.C.S. § 7302(d)(1) provides that this standard of judicial review should apply where paragraph (2), 42 Pa.C.S. 7302(d)(2), applies where the Commonwealth submits a controversy to arbitration; a political subdivision submits a controversy with an employee or a representative of employees to arbitration; or any person has been required by law to submit or to agree to submit a controversy to arbitration pursuant to the statutory arbitration provisions. As to the scope of review, 42 Pa.C.S. § 7302(d)(2) allows a reviewing court to modify or correct an award when "the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict."

Although the judgment n.o.v./error of law was mandated, our Supreme Court, in *Community College of Beaver County,* the case which adopted the federal essence test, also considered whether the judgment n.o.v./error of law test applied to public sector labor contracts under PERA. Finding that the judgment n.o.v. standard applied, it stated:

Both parties assume, with some support in our case law, that the statutory standard [Arbitration Act of 1927, 5 P.S. 170, 17] is substantially different from the Enterprise Wheel and Car standard and provides for much closer scrutiny of arbitration awards than does the federal standard when vacation or enforcement of the award is sought in Pennsylvania courts.... As will be shown in part III, infra, however, we perceive no conflict between the standard of review contained in the Arbitration Act of 1927 and that recognized by federal decisional law in the field of labor relations. The two are not significantly different. (Footnote omitted.)

*Community College of Beaver County,* 473 Pa. at 586–587, 375 A.2d at 1272.

It then went on to compare those tests concluding that "the 'n.o.v.' concept ... is hardly a radical change, nor does it dictate that a much closer or different scrutiny of an arbitration award will be available than under the [essence test]." *Id.,* 473 Pa. at 589, 375 A.2d at 1273. In other words, the essence test and the judgment n.o.v. scope of review are the same.

I respectfully suggest that the "essence test" is not the same as a judgment n.o.v. scope of review. Under the judgment n.o.v. standard, a court can review a judgment to determine whether, as a matter of law, the verdict is incorrect or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003 (1992). While the essence test is a deference test only concerned with wheth-

er the arbitrator derives his decision not from the words of the agreement but from the gist of the words of the agreement, the judgment n.o.v. test is concerned with the outcome—the justness of the result.

A judgment n.o.v. scope of review would allow courts to set aside arbitration awards that come to a manifestly unreasonable outcome thereby protecting the public employer, the union and, most importantly, the public. Because this area is unsettled, I humbly urge the Supreme Court to reexamine what is the proper scope of review of public sector labor arbitrations and adopt the public sector arbitration scope of review contained in the Uniform Arbitration Act, 42 Pa.C.S. § 7302.

In this case, though, we are still governed by the federal public policy exception to the essence test. Because the arbitrator's award in putting the grievant back to work did not violate any federal public policy, I would affirm the order of the trial court upholding the arbitrator's award. Moreover, even if the federal public policy exception applies, the majority fails to remand as required by federal law. Accordingly, I respectfully dissent.

President Judge LEADBETTER and Judge McGINLEY join as to Part III only of this dissenting opinion.