**WESTMORELAND INTERMEDIATE UNIT # 7, Appellant**

v.

**WESTMORELAND INTERMEDIATE UNIT # 7 CLASSROOM ASSISTANTS EDUCATIONAL SUPPORT PERSONNEL ASSOCIATION, PSEA–NEA.**

Commonwealth Court of Pennsylvania.

Argued May 4, 2009.
Decided July 8, 2009.

John M. Ranker, Greensburg, for appellant.

Richard S. McEwen, Edinboro, for appellee.

BEFORE: McGINLEY, Judge, and SMITH–RIBNER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge McGINLEY.

The Supreme Court remanded this case to the Court of Common Pleas of Westmoreland County (trial court) to apply the newly recognized "public policy" exception to the essence test. On remand, the trial

court upheld the grievance arbitration award which reinstated Sherie Vrable (Grievant) without backpay or benefits after she had been terminated for wearing a Fentanyl patch to Westmoreland Intermediate Unit # 7 (Intermediate Unit) where she was employed as a classroom assistant. Intermediate Unit now appeals.

### 1. *History*

Grievant was employed at Intermediate Unit as an elementary school classroom assistant. She was responsible for working on a one-to-one basis or in small groups with eleven emotionally disturbed children. She also assisted in general administrative duties, and escorted children to the restroom, lunch, recess and to and from the buses.

On March 18, 2002, Grievant was found unconscious in the school's restroom as the result of a drug overdose. The evidence established that Grievant was wearing a 100 mcg (microgram) Fentanyl patch[1] on her back while she was performing her duties as a classroom assistant in grades three through five. Grievant obtained the Fentanyl patch from a friend. It was not prescribed to her by a physician. The evidence establishes that Grievant wore the patch because it was "a temptation." Monongahela Valley Hospital Emergency Room Records, March 20, 02, at 1; Reproduced Record (R.R.) at 90a.

By letter dated September 17, 2002, the Intermediate Unit notified Grievant that it intended to terminate her employment due to her "possession and use of a controlled substance, not prescribed to [her], in the workplace during working hours at the West Newton Elementary School." Letter to Sherie L. Vrable, from Westmoreland Intermediate Unit, September 17, 2002, at 1.[2]

Grievant, through Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association (Association), challenged the termination through grievance arbitration.

The Arbitrator sustained the Intermediate Unit's grievance and found that the Intermediate Unit lacked "just cause[3]" to terminate Grievant because her conduct did not rise to the level of "immorality" under Section 1122(a) of the School Code of 1949[4]:

> The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be *immorality*, incompetency, unsatisfactory teaching performance, ... intemperance, cruelty, persistent negligence in the performance of duties, willful neglect of duties, physical or mental disability.... (emphasis added).

The Arbitrator's conclusion was based on the finding that Grievant had an un-

---

**1.** Fentanyl, a narcotic (opioid) analgesic, is a Schedule II controlled substance under Section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (CSDDCA), Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. § 780–104. Under Section 780–113 of the CSDDCA, it is a misdemeanor for a person to possess a Schedule II controlled substance without a valid prescription. According to the National Drug Intelligence Center, Fentanyl is approximately 50 times more potent than heroin and 50–100 times more potent than morphine. National Drug Intelligence Center, Fentanyl Situation Report, June 5, 2006.

**2.** This letter was contained in the certified record, but not in the Reproduced Record.

**3.** Appendix C, Section 9(b) of the Collective Bargaining Agreement (CBA) provided that "employer shall have the right to discipline or discharge for just cause." CBA, October 24, 2000, at 26; Reproduced Record (R.R.) at 33a.

**4.** Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 11–1122(a).

blemished 23–year tenure with the Intermediate Unit. He concluded that this single error of judgment did not amount to such a grievous offense that it would offend the morals of the community. Recognizing the gravity of Grievant's conduct, however, the Arbitrator imposed certain conditions involving rehabilitation that Grievant was required to meet in order to be reinstated. Grievant had to participate in a drug and alcohol treatment program, abstain from mood altering drugs, or chemical substances while on duty, submit to drug/alcohol screenings, and participate in counseling and a treatment program.

The trial court vacated the Arbitrator's award and reinstated Grievant's discharge. It determined that the Arbitrator's award fell within the "core functions" exception to the essence test because Grievant's use of controlled substances while caring for children directly affected the Intermediate Unit's ability to perform its function of providing a safe environment for its students. Trial Court Opinion, August 3, 2004, at 10. Grievant appealed.

This Court upheld trial court's application of the core functions test and concluded that the Intermediate Unit had satisfied the elements necessary to establish the offense of immorality as defined in the School Code. *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association,* PSEA/NEA, 876 A.2d 1108 (Pa.Cmwlth. 2005).

The Supreme Court granted the Intermediate Unit's petition for allowance of appeal to review whether the "core functions" exception was inconsistent with the essence test. Concluding that the "core functions" exception was "insufficiently precise" the Supreme Court replaced it with the public policy exception.

Turning to whether the Arbitrator's award met the essence test, our Supreme Court held that whether Grievant's termination was for just cause was an issue within the terms of the CBA. Next, the Supreme Court concluded, contrary to this Court's decision, that the Arbitrator's interpretation was rationally derived from the CBA.

The Supreme Court left open the issue of whether the Arbitrator's award contravened public policy and remanded the case to the trial court to determine *if the arbitration award reinstating Grievant fell within the newly clarified "public policy" exception.* The specific issue framed by the Court was "whether [Grievant's] reinstatement contravenes a well-defined, dominant public policy that is ascertained by reference to the laws and legal precedents and not from mere general considerations of supposed public interests." *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association,* 595 Pa. 648, 667, 939 A.2d 855, 867 (2007).

### 2. *On Remand*

The trial court considered whether the Arbitrator's reinstatement of Grievant, with the conditions imposed, was a violation of established public policy.[5] The well-defined dominant public policy, all parties agreed, was the protection of children in school from the dangers of illicit drugs and drug use.

---

**5.** On remand the Intermediate Unit posed the issue for the trial court as whether Grievant's conduct was a violation of public policy which would justify termination. However, as the trial court correctly pointed out, the issue was not whether *Grievant's conduct* violated public policy, but rather whether the Arbitrator's award contravened public policy, in this case, the Arbitrator's reinstatement of Grievant with conditions.

The trial court held that the Arbitrator's decision to reinstate Grievant did *not* violate the above-stated public policy. It reasoned that the numerous conditions of reinstatement imposed by the Arbitrator satisfied this policy and held "[w]ith the imposition of these safeguards, the arbitrator has reinforced the public policy of protecting students from the dangers of drug use." Trial Court Opinion, August 6, 2008, at 6.

The trial court went on to hold that Grievant's reinstatement did not contravene the public policy embodied in statutory law, namely the Public Employe Relations Act (PERA)[6] and the Public School Code. In this regard, PERA does not impair the right of employers to discharge employees for just cause. Similarly, under Section 514 of the Public School Code, 24 P.S. § 5–514, a school district has discretion to dismiss only those employees who have engaged in "incompetence, intemperance, neglect of duty, violation of any of the school laws of the Commonwealth, or other improper conduct."

The trial court dismissed the Intermediate Unit's Petition to Vacate the Award of the Arbitrator.

### 3. *The Present Appeal*

On appeal, the Intermediate Unit raises one issue. It contends that the Arbitrator's award, which placed Grievant back into the classroom, clearly contravened public policy and disregarded the protection of elementary school children from the inherent dangers of drugs and drug abuse. Further, the Intermediate Unit argues that medical records admitted into evidence by stipulation at the arbitration hearing demonstrated that Grievant "had an extensive history of drug abuse." Brief of Westmoreland Intermediate Unit # 7, January 14, 2009, at 23.

- I was 30 days clean from opiates. I did detox @ Monsour—it's a five day program.
- A girl called & said she had this Fentanyl patch for me & it was a temptation.
- I started [with] percocets and vicodin then I graduated up to oxycontins.
- I did cocaine over 6 years ago.
- I haven't done oxycontins in @ least 40 days.
- 3–4 Detox Units.—most recent— Monsour × 5 days.
  - The Patient has a history of narcotic abuse and addiction. She has been sober for 30 days and was detoxed at Monsour for five days.
- History of opiate addiction.
- Previous history of abuse of pain pills.

Medical Records, Reproduced Record (R.R.) at 73a–74a, 79a, 81a, 90a–91a.

The Intermediate Unit urges that, given her extensive history of drug abuse her use of the Fentynal patch on the morning she was to report to work, the Arbitrator's reinstatement of Grievant, in effect, condoned the use of drugs in schools and actually posed a risk to those children exposed to Grievant while she attempts recovery. The Intermediate Unit asks this Court to vacate the Arbitrator's award on the grounds that its enforcement would violate public policy.

At this juncture, because the Supreme Court expressly held that the Arbitrator's award met the essence test, this Court must assume that the CBA, as interpreted by the Arbitrator, required Grievant's reinstatement. The relevant inquiry is whether the Arbitrator's award should be vacated under the public policy exception to the essence test; that is, whether enforcement of the CBA to reinstate Griev-

---

**6.** Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301.

ant with the imposed conditions violated a well-defined, dominant and explicit public policy.

Consequently, this Court must (1) first determine whether the public policy cited by Intermediate Unit is a well-defined and explicit policy. If it is, we must then (2) determine whether the trial court properly concluded that enforcement of the Arbitrator's award would not violate that policy.

#### 4. Whether there is an Explicit, Well–Defined, and Dominant Public Policy at Issue

■ There is a fundamental public policy against allowing a person to be in possession of drugs or be under the influence of drugs while caring for, supervising or having custody of children.

■ First, a school system has an unmistakable duty to create and maintain a safe environment for its students as a matter of common law. School districts are charged with the responsibility of supervising children under their control during the time that they are at school under the doctrine of "in loco parentis" to protect children. *See* Section 1317 of the Public School Code, 24 P.S. § 13–1317.

School personnel perform an essential mentoring role and serve as role models for children. Teachers are also in the unique position to observe children to determine if they are involved in activities which may harm or injure them or others. Clearly, if school personnel are themselves under the influence of, or involved in, drugs, their ability to perform their duties is compromised and they may themselves pose a risk to the children and themselves.

Our legislature has explicitly enacted legislation to curtail drug use among teachers. Before a teaching certificate will be granted, Section 1209 of the Public School Code, 24 P.S. § 12–1209, requires the applicant to verify that she does not use narcotic drugs in any form:

No teacher's certificate shall be granted to any person who has not submitted, upon a blank furnished by the Superintendent of Public Instruction, a certificate from a physician legally qualified to practice medicine in this Commonwealth or in any other state or in the District of Columbia, setting forth that said applicant is neither mentally nor physically disqualified, by reason of tuberculosis or any other communicable disease or by reason of mental disorder from successful performance of the duties of a teacher; nor to any person who has not a good moral character, *or who is in the habit of using opium or other narcotic drugs in any form,* or any intoxicating drink as a beverage, or to any applicant who has a major physical disability or defect unless such a person submits a certificate signed by an official of the college or university from which he was graduated or of an appropriate rehabilitation agency, certifying that in the opinion of such official the applicant, by his work and activities, demonstrated that he is sufficiently adjusted, trained and motivated to perform the duties of a teacher, notwithstanding his impediment.

24 P.S. § 12–1209 (Emphasis added).

Moreover, studies show that drug availability, trafficking patterns, and beliefs that drug abuse is generally tolerated may influence a young person in the decision to start abusing drugs. Drug use among school-age children is associated with poor grades, sexual promiscuity, high drop-out rates, and criminal activity. Drugs also damage a child's physical and psychological systems and affect the school as a whole. In order to reinforce the dangers of drugs in and near schools, a number of Pennsylvania statutes articulate a policy in favor of providing a safe drug-free environment for children.

For example, the "School Zone Act" contained in the Crimes Code, 18 Pa.C.S. § 6317(a), mandates enhanced sentences on drug-related convictions for activity occurring within a school zone. The School Zone Act was intended to protect minors from all illegal activity which is necessarily attendant with the drug trade, as well as curtail drug transactions involving minors.[7]

The Legislature also established the "Alcohol, Chemical and Tobacco Abuse Program" which requires public schools to teach school children the dangers of drugs and instruction in alcohol, chemical and tobacco abuse in every year in every grade from kindergarten through grade twelve. Section 1547 of the Public School Code, 24 P.S. § 15–1547.

Also, Section 527 of the Public School Code, 24 P.S. § 5–527, entitled "Drug Law Convictions" provides that any employee of a school district, intermediate unit or area vocational-technical school convicted of delivery of a controlled substance or convicted of possession of a controlled substance with the intent to deliver, as prohibited by the CSDDCA shall be terminated from employment with the school entity.

In addition, the Legislature established a special account in the State Treasury known as the "Drug Abuse Resistance Education (DARE) Fund" to provide moneys for an ongoing educational program in public schools to prevent drug abuse. Section 1905 of the Vehicle Code, 75 Pa.C.S. § 1905.

This Court finds that these statutes and laws taken together serve the public purposes of ensuring that school children are educated about the dangers of drugs and not exposed to drugs or those under the influence of drugs.

### 5. Whether the Arbitrator's Reinstatement of Grievant Violated Public Policy

Again, the question is not whether Grievant's use of the Fentanyl patch while on duty as a school assistant violated public policy. The question is, rather, whether the reinstatement of Grievant with conditions violated public policy.

This Court recently vacated an arbitrator's award which violated public policy in *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees*, 956 A.2d 477 (Pa. Cmwlth.2008), *allow. of appeal granted*, 558 EAL 2008, filed May 18, 2009.

There, Philadelphia Housing Authority's (PHA) fired Thomas Mitchell (Mitchell) because he violated the sexual harassment policy. A grievance was filed on Mitchell's behalf which alleged that PHA violated the parties' CBA, which provided, in part, that "[n]o disciplinary action or discharge shall be imposed upon any employee without just cause." *Philadelphia Housing Authority*, 956 A.2d at 479.

The complainant testified that Mitchell once went into a changing room while she was changing and on another occasion he ground his penis into her for approximately fifteen seconds. He also told her that he wanted to have sex. The Arbitrator credited the testimony of the complainant and characterized Mitchell's behavior as "lewd, lascivious and extraordinarily perverse." *Philadelphia Housing Authority*, 956 A.2d at 481.

Despite these findings, the Arbitrator determined that PHA did not establish just cause to terminate Mitchell because management knew of and condoned horseplay of a sexual nature, and, prior to

---

**7.** Pennsylvania's School Zone Act was based on the federal "Safe and Drug–Free Schools and Communities Act" 20 U.S.C. § 7101 et seq., was enacted to preserve health and safety with respect to the use of drugs, and to safeguard the health and safety of children.

Mitchell's discharge, the only action taken in terms of counseling or disciplining him was a warning.

The Arbitrator sustained Mitchell's grievance and reinstated him with back pay. PHA filed a petition to vacate the award which the trial court denied. On further appeal, this Court held that the PHA's legal obligation to protect its employees from sexual harassment in the workplace constituted a "core function" of the agency that PHA could not bargain away. This Court reversed the trial court because the arbitrator's award was not rationally derived from the CBA and should not be enforced.

The Union petitioned for allowance of appeal. The Supreme Court granted the Union's petition, vacated this Court's order and remanded with instructions to reconsider PHA's petition to vacate in light of *Westmoreland Intermediate Unit # 7.*

Recognizing that there is an explicit, well-defined, and dominant public policy against sexual harassment in the workplace, this Court held the arbitrator's interpretation of the CBA and his reinstatement of Mitchell without conditions so undermined public policy that the award could not be upheld. "To find substantial evidence supporting some type of disciplinary action for Title VII purposes but not for purposes of a 'just cause' provision in the CBA would frustrate the important, well-established public policy against sexual harassment in the workplace." *Philadelphia Housing Authority,* 956 A.2d at 487.

■ In the controversy sub judice, clearly, the Arbitrator recognized Grievant had an ongoing drug problem as set forth in the medical records because he required that she participate in a drug and alcohol counseling and treatment program, abstain from mood altering drugs, or chemical substances while on duty, and submit to drug/alcohol screenings. The Court recognizes that his attempt to rehabilitate Grievant is admirable.

However, this Court must conclude that Grievant's immediate reinstatement to the classroom while she attempted rehabilitation violated public policy. Again, Fentanyl is Schedule II controlled substance, the effects of which are much like heroin, except only more potent. The effects of the Fentanyl on Grievant were indeed deleterious based on the graphic description in the record.[8] As the Intermediate Unit points out, to reinstate an employee who attended work while under the influence, while charged with the duty to oversee young children, with the hope that she will overcome her addiction, defies logic and violates public policy. The award essentially would allow Grievant to be placed back into the classroom pending her attempts at recovery. As noted above, the public policy of educating our children about the dangers of illicit drugs and drug abuse and protecting children from exposure to drugs and drug abuse is compelling. Simply put, an elementary classroom is no place for a recovering addict. It demonstrates a tolerance, rather than intolerance for illicit drug use, and is in direct contravention of public policy.

Accordingly, this Court must conclude that the Arbitrator's award violated a well-defined, dominant public policy to protect

8. On March 18, 2002, Grievant was found unconscious, partially nude, seated on the commode in the school's restroom, leaning to her left up against the wall with her head and neck facing downward. She was in respiratory distress. The school was put on Code Blue, and locked down. Grievant was taken from the school by ambulance to a local emergency room where it was determined that she had overdosed. After she was stabilized, Grievant was transferred to the mental health unit where she remained until March 21, 2002.

school children from illegal drugs and drug use. It must not be enforced.

The order of the trial court is reversed, and the Arbitrator's award is vacated as being in violation of public policy.

### ORDER

AND NOW, this 8th day of July, 2009, the order of the Court of Common Pleas of Westmoreland County in the above-captioned case is hereby reversed and the Arbitrator's award is vacated as being against public policy.

### DISSENTING OPINION BY Senior Judge FRIEDMAN.

Because I disagree that the grievance arbitration award reinstating Sherie Vrable (Grievant), without backpay and benefits and subject to multiple conditions, violates the public policy exception to the essence test, I respectfully dissent.

In this case, Grievant was employed at Westmoreland Intermediate Unit # 7 (Intermediate Unit) as an elementary school classroom assistant, responsible for working with emotionally disturbed students. On March 18, 2002, she was discovered in the school's restroom suffering the effects of a drug overdose caused by the Fentanyl patch she was wearing on her back.[1] On March 27, 2002, the Intermediate Unit suspended Grievant without pay until further notice and, on September 24, 2002, terminated Grievant. The Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association (Association) filed a grievance on Grievant's behalf alleging that the Intermediate Unit did not have just cause to discharge Grievant.

The grievance ultimately was submitted to arbitration, and the Arbitrator was asked to determine whether the Intermediate Unit had just cause to discharge Grievant under Appendix C, section 9(b) of the Collective Bargaining Agreement (CBA), based on the assertion that her March 18, 2002, possession and use of a controlled substance at work constituted "immorality" under section 1122(a) of the Public School Code of 1949 (Code).[2]

The Arbitrator concluded that the Intermediate Unit lacked just cause to terminate Grievant because her conduct did not rise to the level of "immorality" under Code section 1122(a), defined by case law as "a course of conduct that offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and elevate." (Arbitrator's op. at 6, R.R. at 43a, citations omitted). Although the Arbitrator did not condone Grievant's "foolish and irresponsible behavior," he found that it was "one and only one workplace incident" in a span of twenty-three years with the Intermediate Unit. (Arbitrator's op. at 7, R.R. at 44a.) Therefore, the Arbitrator concluded

---

**1.** Criminal charges were filed against Grievant for possession of a controlled substance, and Grievant subsequently executed and submitted a Petition for Probation Without Verdict, in which she pled guilty to the charge. Probation Without Verdict is a probationary program for first offenders accused of non-violent possessory offenses. No verdict is entered against the defendant at the time, and the case is deferred. If the defendant successfully fulfills the terms and conditions of probation, the court dismisses the charges against him or her. However, if the defendant violates any terms or conditions of probation, the court may proceed as in any criminal case or may continue the probation. By order dated October 18, 2002, Grievant was placed on one-year probation. (Arbitrator's decision at 4–5, R.R. at 41a–42a.)

**2.** Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 11–1122(a). Appendix C, section 9(b) of the CBA provides, in relevant part, that the employer shall not discharge an employee without just cause, which includes any causes included for professional employees in section 1122 of the Code. (R.R. at 33a.)

that, when viewed dispassionately, this single episode was not a course of conduct that would offend the morals of the community, and he sustained the grievance.

The majority takes pains to point out that Grievant had a history of drug abuse, implying that such past conduct should be considered in determining whether the Arbitrator's award should be set aside. I recognize that the record contains evidence that Grievant had a past history of depression and addiction to pain killers; however, it is undisputed that Grievant's discharge on grounds of "immorality" under section 1122(a) of the Code was based *solely* on the incident of March 18, 2002. Because information of past drug involvement was irrelevant to the issue before him, the Arbitrator properly made no findings in that regard.[3] Instead, the Arbitrator specifically found that, while serious, the isolated incident for which Grievant was discharged represented a single lapse of judgment in an otherwise long and unblemished employment history with the Intermediate Unit and, thus, did not warrant termination.

Moreover, the Arbitrator did not ignore the gravity of Grievant's offense or the fact that she may have ongoing drug issues; consequently, the Arbitrator fashioned an award that, while imposing a lesser discipline, directly addressed the offending conduct and provided a last chance agreement expressly designed to prevent its recurrence. Specifically, the award reinstated Grievant effective the first work day of the 2003/04 school year,[4] without back pay or benefits for the eighteen months she was away from work, conditioned on her written agreement to: (1) complete the terms and conditions of her one-year probation period pursuant to an October 18, 2002, court order; (2) participate in and complete a structured drug and alcohol counseling and treatment program, be bound by all its conditions and sign a release of information form so that the Intermediate Unit may be in contact with the treating organization; (3) abstain from all mood-altering drugs and chemical substances while on duty; (4) be subject to random drug/alcohol testing, with her immediate removal upon a positive result in any measure; (5) meet and maintain acceptable performance, conduct and leave usages, which are to be monitored by the Intermediate Unit; and (6) provide the Intermediate Unit with regular written reports of her treatment with sufficient specificity to allow Intermediate Unit to determine whether Grievant is abiding by the terms of the award. A breach of the award by Grievant in any way at any time during the 2003/04 school year would result in her immediate removal for violation of the last chance agreement. (Arbitrator's award at 7–8, R.R. at 44a–45a.)

As recognized by the majority, this court must assume that the CBA, as interpreted by the Arbitrator, required the award handed down. Thus, the issue presented to this court on appeal is whether Grievant's conditional reinstatement, without

---

3. Because it was inappropriate for the Arbitrator to consider Grievant's past medical history, consideration of that same information certainly is beyond this court's appellate scope of review.

4. I note that Grievant was relieved of her duties in March 2002, that the Arbitrator's award was issued on June 30, 2003, and that reinstatement was to begin "effective the first work day for the bargaining unit in the 2003/04 school year." (R.R. at 44a.) Generally, school begins early in September; thus, the award did not provide Grievant with "immediate reinstatement to the classroom." (Majority op. at 1211–12.) In fact, at the time Grievant was scheduled for reinstatement, she nearly would have completed the one-year probation period (from October 18, 2002, through October 18, 2003) imposed by court order, one of the conditions of her reinstatement.

back pay and benefits, contravenes the well-defined dominant public policy to protect children in school from the dangers of illicit drugs and drug use. The majority holds that it does and, as support for its decision, cites *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees*, 956 A.2d 477 (Pa.Cmwlth.2008), *petition for allowance of appeal granted by* —— Pa. ——, 972 A.2d 482 (2009), wherein this court vacated an arbitrator's award as violative of public policy. However, critical distinctions between *Philadelphia Housing* and the present case compel a contrary result in the matter now before us.

In *Philadelphia Housing*, Thomas Mitchell, an employee of the Philadelphia Housing Authority (PHA), was discharged for sexual harassment of a female co-worker after an investigation of the co-worker's formal complaint revealed that she had been subjected to an ongoing course of sexual harassment by Mitchell and that Mitchell had a pattern of sexually harassing female employees. The arbitrator characterized Mitchell's behavior as "lewd, lascivious and extraordinarily perverse" but, nevertheless, concluded that PHA did not establish just cause to terminate, as required by the parties' CBA. The arbitrator sustained Mitchell's grievance and awarded a "make whole" remedy, which provided for Mitchell's unconditional reinstatement with back pay. PHA's petition to vacate the award was denied by the trial court, but this court reversed on appeal.[5]

In doing so, we identified the explicit, well-defined and dominant public policy against sexual harassment in the workplace, including employer prevention of such harassment, investigation of complaints of harassment and application of appropriate sanctions against those who commit such conduct. We then noted that "[i]n cases where courts have upheld arbitrators' awards reinstating employees who have committed sexual harassment, there still has been some significant sanction against the offending employee."[6] *Philadelphia Housing*, 956 A.2d at 485. Finally, we stated,

in considering the issue before us, we must assume that the CBA itself calls

---

**5.** We initially reversed based on a "core function" analysis; however, our supreme court vacated that order and remanded with instructions that we reconsider PHA's petition in light of *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 595 Pa. 648, 939 A.2d 855 (2007). In that case, our supreme court articulated new principles governing the "essence test" standard of review of grievance arbitration awards under the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101–1101.2301, by replacing the "core function" exception to the essence test with the public policy exception to the essence test applied in federal courts. On remand, we again reversed, holding that the arbitrator's award violated public policy.

**6.** Among the various cases discussed, the following seems particularly relevant here.

In *Communication Workers of America v. Southeastern Electric Cooperative of Durant, Oklahoma*, 882 F.2d 467 (10th Cir.1989), the employer discharged an employee after a customer reported that he had sexually harassed her. In modifying the discipline imposed, the arbitrator recognized this as a one-time offense and noted the employee's otherwise unblemished record and his penitent and apologetic attitude. The arbitrator concluded that the single offense, albeit serious, should not lead to discharge and that a one-month suspension without pay was commensurate with the improper conduct. The Tenth Circuit upheld the award, expressly noting that the arbitrator imposed corrective discipline and had fully incorporated the important public policy against sexual harassment into his reasoning. *Philadelphia Housing*, 956 A.2d at 485–86. (Footnotes omitted.)

for the remedy set forth in the [a]rbitrator's award; the question to be asked is does a CBA requirement to reinstate Mitchell *without conditions and make him whole* run counter to the identified public policy against sexual harassment in the workplace. In light of the cases discussed above, we conclude that the [a]rbitrator's interpretation of the CBA so undermines the stated public policy that it cannot be enforced.

*Philadelphia Housing*, 956 A.2d at 486. (Emphasis added, citations omitted.)

We agreed that termination was not required in every case of sexual harassment, but we emphasized that there must be *some* correlation between an employee's misconduct and an employer's response. Observing that the arbitrator had interpreted the CBA as requiring *unconditional* reinstatement of an employee who committed numerous acts of sexual harassment, we concluded that an employer forced to honor that arbitration award would not comply with public policy requirements that an employer impose appropriate discipline for proven cases of sexual harassment in order to ensure a safe work environment free of such conduct. In other words, because the arbitrator in *Philadelphia Housing* specifically found that Mitchell was guilty of *repeated, egregious acts* of sexual harassment against a co-worker and yet imposed *no discipline whatsoever* on the offending employee, this court found that the award contravened public policy.[7] *Philadelphia Housing*.

The situation in the present case stands in stark contrast to that in *Philadelphia Housing*. Here, the Arbitrator found that Grievant's use of the Fentanyl patch on March 18, 2002, was a *single, irresponsible* act in a lengthy and otherwise flawless career and, therefore, did not qualify as just cause for her termination. However, the Arbitrator did not award a "make whole" remedy. Instead, the Arbitrator effectively upheld an eighteen-month suspension without pay, which the Arbitrator determined was discipline commensurate with Grievant's isolated act of drug use at work. In addition, the Arbitrator imposed conditions on Grievant's reinstatement that would serve to ensure that she would be drug-free in the future.

All this seems lost on the majority, which, in its conclusion, adopts the position of the Intermediate Unit that

> to reinstate an employee who attended work while under the influence, while charged with the duty to oversee young children, with the hope that she will overcome her addiction, defies logic and violates public policy.... Simply put, an elementary classroom is no place for a recovering addict. It demonstrates a tolerance, rather than intolerance for illicit drug use, and is in direct contravention of public policy.

(Majority op. at 1211–12.)

The majority ignores that an addict is always recovering, never cured. Thus, with this decision, the majority precludes the possibility of a grievance arbitration award imposing any discipline short of termination for such an employee and also prevents that terminated employee (or any recovering addict) from securing future

---

**7.** Indeed, in *Philadelphia Housing*, we implied that if the arbitrator had imposed any reasonable discipline on Mitchell, we would have reached a different result. As we stated, "In cases where, as here, the arbitrator found that the discharged employee committed the sexual harassment for which he was terminated, any decision to reinstate the offending employee has always included imposition of some discipline designed to deter future offending conduct. However, in this case, the [a]rbitrator's award simply removed the discharge imposed by PHA without substituting a lesser penalty in its place." *Philadelphia Housing*, 956 A.2d at 487 n. 19.

employment in the educational field. As important as it is to eliminate drug use from schools, I cannot agree with the creation of such precedent.

A court's refusal to enforce an arbitrator's interpretation of a collective bargaining agreement is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *W.R. Grace and Company v. Local Union 759, International Union of United Rubber, Cork, Linoleum and Plastic Workers of America,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)). The federal public policy exception does not go to the correctness of the underlying merits but only to the legality of the remedy. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers International Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

Grievant's *conduct* on March 18, 2002, clearly violated the fundamental public policy against allowing a person in possession of, or under the influence of, drugs to supervise the care and custody of school children, and the majority obviously believes that such conduct disqualifies Grievant from holding a teaching position. However, as the majority correctly states, "the question is not whether Grievant's use of the Fentanyl patch while on duty as a school assistant violated public policy. The question is, rather, whether the reinstatement of Grievant with conditions violated public policy." (Majority op. at 1210.) Unlike the majority, I agree with the trial court that the Arbitrator's *award* does not violate the stated policy. To the contrary, not only has the Arbitrator imposed significant discipline on Grievant for the offending conduct, but, through the numerous conditions of reinstatement, the Arbitrator has created safeguards that reinforce this important public policy. Accordingly, I would affirm.