# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

School District of Philadelphia     :
                                       :

              v.                   :    No. 152 C.D. 2016
                                         :    Argued: February 7, 2017

Commonwealth Association of    :
School Administrators, Teamsters   :
Local 502,                            :
                  Appellant    :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE DAN PELLEGRINI, Senior Judge


*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**            **FILED: April 13, 2017**

The Commonwealth Association of School Administrators, Teamsters Local 502 (Association), appeals from an order of the Court of Common Pleas of Philadelphia County (trial court), granting School District of Philadelphia's (District) petition to vacate an arbitration award. For the reasons that follow, we reverse.

The facts underlying this matter are not in dispute. The Association is a labor union that represents school principals and other administrators. The Association brings the instant appeal on behalf of Michelle Burns (Burns), the former principal of William T. Tilden Middle School (Tilden), located within the District. Burns was first hired by the District as a teacher in 1997. The District appointed her as principal of Tilden in 2006 where she served until 2010. In 2010,

she became the principal at Kensington Urban Education Academy High School until the District terminated her employment on January 15, 2014.

Pennsylvania requires every school district to administer to its students a standardized examination called the Pennsylvania System School Assessment (PSSA). The PSSA measures students' competency in various academic subjects and is also used to rate faculties, administrators, schools, and districts based on the student bodies' performance.

In 2011, the Pennsylvania Department of Education (Department) conducted a statistical analysis which revealed a high number of "beneficial erasures" at several schools in the District. Beneficial erasures occur when an incorrect answer on a standardized test is erased and the correct answer is marked instead. The Department instructed the District to investigate several of the identified schools, including Tilden. Based on its investigation, the District concluded that the beneficial erasures at several schools, including Tilden, were the result of improper conduct. Specifically, the investigation concluded that school employees altered the tests in an attempt to bolster the school's overall performance on the PSSA. The investigation determined that 100 percent of Tilden's PSSA tests in 2009 and 2010 were altered. The District alleged that Burns, who was the principal of Tilden during the time covered by the analysis, actively participated in the improper conduct or knowingly allowed the conduct to continue. Alternatively, the District alleged that, if Burns was unaware, she acted negligently by failing to discover and prevent such misconduct. On January 15, 2014, the District terminated Burns' employment based on these allegations.

Effective September 1, 2013, the Association and the District entered into a Collective Bargaining Agreement (CBA) which set forth the terms and conditions of employment for administrators employed by the District. Article 2, Section 2.1 of the CBA provides that the District "shall retain the sole right to hire, discipline or discharge for cause, lay off, transfer and assign Administrators." (Reproduced Record (R.R.) at 22a.) The Association filed a grievance pursuant to Article 5 of the CBA. Article 5 of the CBA defines a grievance as "a claim of a violation of any specific provision of this Agreement or of any Personnel Policy or Regulation which has been or shall be adopted by the [District]." (R.R. at 27a.)

Pursuant to the procedures set forth in the CBA, the Association filed a grievance contesting the District's decision to terminate Burns' employment. A single arbitrator (Arbitrator) conducted a hearing on April 30, 2015.

At the hearing, the Association argued that the District could present no evidence that Burns was directly involved in any misconduct and, even assuming that she was negligent in allowing the conduct to occur while she served as principal, termination of her employment was a disproportionate consequence for her mere lapse in oversight. Burns testified that she did not participate in any cheating and was not aware of any other school employees improperly helping students on exams. She also testified that Tilden hired an outside testing contractor to insure the integrity of the PSSA testing process. Burns additionally noted that the testing contractor offered her incentives if Tilden achieved acceptable yearly progress on PSSA scores, but, because she announced her intent to leave Tilden in December of 2009, she would not have received an incentive based on test scores in 2010.

3

The District called five witnesses in support of its decision to terminate Burns' employment. The first two witnesses, Donyall Dickey, the District's chief academic officer and Jordan Floyd, a teacher at Tilden during Burns' tenure as principal, testified regarding the importance of the PSSA testing and how a school's overall scores affect the chances of a principal to be promoted to a superintendent position. The third witness, Dr. Uma Jayaraman, testified that the District was required to train testing coordinators for the PSSA and that the principal of each school was responsible for insuring that all school employees followed proper testing procedures and security protocols. Jeff Robinson, the District's project manager for testing logistics, testified that the analysis of PSSA answer sheets demonstrated that the number of beneficial erasures at Tilden was four standard deviations above the state-wide average. Robinson also noted that the number of beneficial erasures dropped to nearly zero the year after Burns left Tilden. Finally, Jessica Diaz, former assistant general counsel to the District, testified that a large, national law firm analyzed the number of beneficial erasures at several Philadelphia schools in 2009, 2010, and 2011. Diaz testified that the analysis concluded that systematic cheating was occurring at Tilden across all grades, subjects, and classrooms. Diaz stated that, according to the report, Burns, as principal of the school, must have directly facilitated the cheating or willfully ignored it, or she was completely oblivious to her responsibilities as principal. Diaz also stated that other teachers and administrators had admitted to cheating while working at Tilden, although none of these individuals responded to the District's calls to testify at the arbitration hearing.

The Arbitrator issued his decision and award (Award) on August 16, 2015. The Arbitrator sustained the Association's grievance in part and

denied it in part, concluding that Burns did not actively participate in cheating at Tilden, but that she failed in her supervisory responsibilities and in exercising oversight over PSSA test security. In light of his conclusion that Burns did not actively participate in any misconduct, the Arbitrator determined that termination was a disproportionate penalty for failure to supervise adequately and mitigated Burns' suspension to a period of 60 calendar days without pay. Because Burns had not been employed during the pendency of the grievance, the Arbitrator ordered the District "to reinstate her as soon as practicable to the principal position she held before she was fired." (R.R. at 17a.)

The District filed in the trial court a petition to vacate the Award, and the Association filed its answer and new matter, seeking confirmation of the Award. Before the trial court, the District argued that the Award cannot logically flow from the provisions of the CBA and that the Award violates public policy by reinstating an administrator involved in a cheating scandal. The trial court concluded that the Award was not rationally derived from the CBA because the Arbitrator made the factual determination that Burns committed a terminable offense, *i.e.* neglected her supervisory duties as principal, yet failed to recognize the explicit language of the CBA granting the District the "sole right" to determine the appropriate level of discipline. (Trial court op. at 3.) By order dated January 13, 2016, the trial court granted the District's petition and vacated the Arbitrator's Award. The trial court reasoned that the Arbitrator's decision was based on a "just cause" analysis, which was not supported by any provision of the CBA, and that the decision to reinstate Burns violated a clear public policy against school administrators condoning cheating. The Association appealed the trial court's order to this Court.

5

On appeal, the Association argues that the trial court erred in vacating the Award for three reasons: (1) the trial court invaded the province of the Arbitrator by concluding that he incorrectly applied a "just cause" analysis; (2) the trial court incorrectly concluded that the Arbitrator exceeded his authority by modifying the discipline imposed by the District; and (3) the trial court erred in determining that the Award violated public policy.

Although our Supreme Court has held that an arbitrator's interpretation of a CBA should be given great deference, the arbitrator's decision must be rationally derived from the terms of the CBA. *Office of the Attorney General v. Council 13, Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO,* 844 A.2d 1217, 1222 (Pa. 2004) (*OAG*). We have previously explained the "essence test" used to determine whether an arbitrator's Award is rationally related to the terms of the CBA, as follows:

> As stated by the Pennsylvania Supreme Court in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA,* 939 A.2d 855 (Pa. 2007), the essence test was derived from the United States Supreme Court's decision in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960), wherein, the Court held: An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.

> The *Westmoreland* Court further explained:

> > Recently . . . we reaffirmed the essence test and set forth a clear two-prong approach to judicial review of grievance arbitration awards: First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if

6

the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement.

*Bethel Park Sch. Dist. v. Bethel Park Fed'n of Teachers, Local 1607*, 55 A.3d 154, 157 (Pa. Cmwlth. 2012) (internal quotations omitted), *appeal denied*, 62 A.3d 380 (Pa. 2013).[1]

We first address the Association's argument that the trial court inappropriately intruded upon the domain of the Arbitrator by rejecting his interpretation of "cause" under the CBA. To the extent that the trial court held that the Arbitrator erroneously interpreted the definition of "cause" contained in Article 2.1 of the CBA, the trial court clearly erred. It is a foundational principle of arbitration that a court may not substitute its own judgment for that of the arbitrator. *See Pa. State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. & Univ. Faculties*, 98 A.3d 5 (Pa. Cmwlth. 2014). An arbitrator is charged by the parties with a duty to apply and interpret the contract, including the concept of just cause. *See OAG*, 844 A.2d at 1217. The trial court's disagreement with the arbitrator's interpretation is not alone sufficient to set aside the arbitrator's interpretation.

---

[1] We note that the District cites our decision in *Riverview School District v. Riverview Education Association*, 639 A.2d 974, 977 (Pa. Cmwlth. 1994), *appeal denied*, 655 A.2d 518 (Pa. 1995), for the proposition that a court may vacate an arbitrator's award if the court determines that the award was "manifestly unreasonable." *Riverview Sch. Dist.*, 639 A.2d at 977. Our Supreme Court, however, has expressly stated that the essence test does not allow a court to evaluate the reasonableness of an award. *Pennsylvania Game Comm'n v. State Civil Service Comm'n (Toth)*, 747 A.2d 887, 891 n.7 (Pa. 2000) (*Toth*) ("Thus, we reiterate that the essence test does not permit an appellate court to intrude into the domain of the arbitrator and determine whether an award is manifestly unreasonable."); *Westmoreland*, 939 A.2d at 863.

7

The trial court initially determined that the Arbitrator misapplied Section 1122 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 11-1122 (School Code), which provides, in pertinent part:

> The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality; incompetency . . . intemperance; cruelty; persistent negligence in the performance of duties; willful neglect of duties . . . conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; persistent and willful violation of or failure to comply with school laws of this Commonwealth (including official directives and established policy of the board of directors); on the part of the professional employe. . . .

The trial court reasoned that, because "cause" is statutorily defined, the Arbitrator was without authority to interpret the definition of cause contrary to the statute. This analysis, however, is precisely the type of analysis disfavored by our Supreme Court in *Toth*. A court may not look into an arbitrator's decision and decide whether the arbitrator's interpretation is reasonable. *State Sys. of Higher Educ. (Cheyney Univ.) v. State College Univ. Prof'l Ass'n (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999). The Arbitrator interpreted the term "cause" within the contract to mean "just cause." The Arbitrator did not equate "cause" under the contract to be a "valid cause for termination" pursuant to Section 1122. The Arbitrator was interpreting a provision of the CBA rather than a statutory provision. Thus, to the extent the trial court held that the Arbitrator misinterpreted the definition of cause in the CBA, the trial court erred by exceeding the scope of its review.

Moreover, we see no conflict in the Arbitrator's interpretation of the CBA and Section 1122 of the School Code. Section 1122 of the School Code provides that only certain enumerated conduct by a professional employee amounts

8

to "cause[s] for termination." In other words, Section 1122 of the School Code prescribes the circumstances under which a school district *may* terminate a professional employee. It does not, however, mandate that a school district terminate any professional employee found to have engaged in such conduct. It also does not preclude a professional employee from grieving a termination decision for one or more of the authorized "causes" identified in Section 1122 of the School Code. The authority of an arbitrator, then, to review a termination decision and to mitigate discipline imposed by a school district is not restricted by Section 1122 of the School Code. Instead, we must look to the parties' CBA for any such restrictions on the arbitrator's authority.

Accordingly, we next address the Association's argument that the trial court erred in concluding that the Arbitrator exceeded his authority under the CBA when he modified the discipline imposed. The trial court concluded that the express terms of the CBA preclude the Arbitrator from modifying the discipline assessed by the District. The trial court essentially determined that the Arbitrator's role was to make the factual determination of whether any cause for discipline exists. If the Arbitrator determined that Burns committed any offense subject to discipline, then, under the trial court's analysis, the District had unfettered discretion to impose any discipline it saw fit. Under this analysis, the penalty imposed is not reviewable by an arbitrator.

We have recently held that, absent a clear limitation in the CBA, it is within an arbitrator's authority to modify the discipline imposed by a school district: "[The a]rbitrator also determined [the g]rievant's conduct did not constitute just cause for her dismissal. In accord with the CBA, it is solely within [the a]rbitrator's province to find just cause for discipline under the facts of the

9

case. This includes the authority to modify discipline." *Rose Tree Media Secretaries & Educ. Support Pers. Ass'n v. Rose Tree Media Sch. Dist.*, 136 A.3d 1069, 1080 (Pa. Cmwlth. 2016) (internal citations omitted); *see also Blue Mountain Sch. Dist. v. Soister*, 758 A.2d 742 (Pa. Cmwlth. 2000) (holding that, even under manifestly unreasonable standard, arbitrator's interpretation of "just cause" can include modification of discipline if arbitrator concluded that penalty imposed was excessive). In *Rose Tree*, this Court applied the two-pronged essence test, set forth above, to determine whether an arbitrator's modification of the discipline imposed by a school district was rationally derived from the CBA. The parties in *Rose Tree* stipulated that the arbitrator had authority to decide the issue before him, and, thus, the first prong of the essence test was met. This Court examined the relevant language contained in the parties' CBA, which provided, in pertinent part:

> [Employer] and the Association expressly agree that the Board and the Administration shall have the right to discipline an employee for cause. Disciplinary actions which the Board or Administration may take, provided that cause exists, shall include, but not be limited to, oral reprimand, written warning, written reprimand, unsatisfactory rating or dismissal for cause.

*Rose Tree,* 136 A.3d at 1076. Based on this language, we held that the CBA did not limit the arbitrator's authority to determine whether just cause existed and to modify the discipline imposed by the school district.

We have previously distinguished between a provision of a CBA which allows an arbitrator to review and modify a district's disciplinary ruling and a provision that expressly reserves for the employer the right to decide the appropriate form of discipline:

10

> An arbitrator generally has the power, and specifically under this Agreement, to interpret its provisions . . . and we will not reverse unless the interpretation of the agreement fails to draw itself from the essence of the agreement. Regarding whether arbitrators have correctly decided that they had the power to modify discipline imposed by the employer under the Agreement, we have held that where the agreement does not specifically define or designate the discipline to be imposed, and does not specifically state that the employer is the one with sole discretion to determine the discipline, the arbitrator is within his or her authority in construing the agreement to modify the discipline imposed to reflect a reasonable interpretation of the agreement.

*Abington Sch. Dist. v. Abington Sch. Serv. Pers. Ass'n/AFSCME*, 744 A.2d 367, 369 (Pa. Cmwlth. 2000). In *Abington*, we concluded that the language in the CBA must be specific to reserve the authority to impose discipline to the school district in contrast to language generally reserving authority to a district.[2]

---

[2] The Court in *Abington* found that, for the discipline imposed not to be subject to arbitration, the language must be similar to that in *Board of Education of the School District of Philadelphia v. Philadelphia Federation of Teachers, AFL–CIO*, 610 A.2d 506 (Pa. Cmwlth. 1992) (*Philadelphia Federation*), which provided "the arbitrator shall have no power or authority to make any decision contrary to or inconsistent with terms of the agreement or applicable law or which limits or interferes with the powers and responsibility of the [d]istrict." *Philadelphia Fed'n*, 610 A.2d at 508. This Court reached a similar holding in *Riverview*, wherein we held that the reference to Section 1122 of the School Code, which provides, in part that "[t]he [school district] . . . shall . . . have the right at any time to remove any of its officers, employes, or appointees for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct," was sufficient to reserve discretion to decide the appropriate discipline to the school district. A review of *Philadelphia Federation* and *Riverview*, however, reveals that both cases based their conclusions on a "manifestly unreasonable" analysis. *See Riverview*, 639 A.2d at 978-79 (holding "it is therefore manifestly unreasonable to conclude that the School District could have intended to bargain away its absolute responsibility to insure the integrity of its educational mission by discharging an employee who commits improper conduct.") Accordingly, our analysis may be informed by

**(Footnote continued on next page…)**

11

We now address whether the Arbitrator's interpretation of the CBA as allowing the Arbitrator to modify the discipline imposed was rationally derived from the CBA or whether the CBA clearly reserved to the District the right to determine the appropriate discipline. The relevant provisions of the CBA are as follows. Article 2.1 of the CBA provides that the District "shall retain the sole right to hire, discipline or discharge for cause, lay off, transfer and assign Administrators." (R.R. at 22a.) Article 2.3 provides that the CBA "is not intended to modify by any of its terms any discretionary authority concerning such matters vested in the [District] by the statutes of the Commonwealth or the Philadelphia Home Rule Charter, as the same may be supplemented or amended from time to time." (R.R. at 23a.) Article 10.6 of the CBA, which relates to personnel practices, provides that "[a]dministrators may be disciplined for cause at the discretion of the [District]. Discipline shall include discharge, suspension, demotion in salary or status or any other action disciplinary in nature." (R.R. at 45a.) Article 5.5(l) of the CBA provides:

> The Arbitrator shall have the power and authority to decide and shall limit his/her decision strictly to the matter specified in the Notice of Arbitration. The Arbitrator shall be without power or authority to make any decision that is:
>
> (1) Contrary to or inconsistent with, or which modifies or varies in any way, the terms of this

---

**(continued…)**

our prior holdings in *Riverview* and *Philadelphia Federation* to the extent those decisions analyzed whether the language in the CBA clearly reserved the discretion to determine the appropriate discipline to the District. Because the standard of review applied by those decisions has been disfavored, however, we are not bound by their conclusions.

12

Agreement or of applicable law or rules or regulations having the force and effect of law; or

(2) Which limits or interferes in any way with the power, duties, responsibilities and discretion of the Board and/or [School Reform Commission (SRC)] under its By-Laws, applicable law, or rules and regulations having the force and effect of law.

(R.R. at 29a.)

The District asserts that these Articles, read in conjunction, are intended to reserve the authority to decide appropriate discipline to the District. Although the District has asserted colorable arguments as to how certain provisions of the CBA could be interpreted to limit an arbitrator's authority, the Arbitrator interpreted the provisions to allow him to modify the discipline imposed by the District, and no provision of the CBA expressly precludes the Arbitrator from modifying the discipline imposed by the District. The essence test does not allow a reviewing court to decide *de novo* whether an arbitrator correctly interpreted his or her authority under the CBA. *State Sys. of Higher Educ. (Cheyney Univ.)*, 743 A.2d at 413. Instead, we need only determine whether the arbitrator's authority is rationally derived from the CBA. *Bethel Park Sch. Dist.*, 55 A.3d at 157. Presumably, the Arbitrator determined that his authority derived from Article 5.5 of the CBA, which authorizes the Arbitrator to decide issues placed before him by the parties through the Notice of Arbitration unless otherwise limited by the CBA, statutes, or regulations. In this instance, the issue before the Arbitrator was the following: "Did the District have just cause to terminate [Burns] and, if not, what shall be the remedy?" (R.R. at 9a.) As explained above, our prior precedent has established that the authority to modify discipline is inherent in an arbitrator's authority to determine whether just cause for discipline exists, unless the authority to modify discipline is expressly reserved

13

to the District.  *See Rose Tree*, 136 A.3d at 1080.  The Arbitrator concluded that no provision of the CBA, statute, or regulation expressly limited his authority to modify the discipline imposed by the District.  Accordingly, the Arbitrator determined that "termination is a disproportionate penalty that shall be mitigated to a suspension without pay."  (R.R. at 17a.)

In the context of a school district arguing that a provision of the CBA excluded a particular class of violations from arbitration, we held:

> Clearly, the best evidence that parties to a public employment collective bargaining agreement intended not to arbitrate a particular class of disputes is an express provision in the agreement excluding these questions from the arbitration process.  Where, as here, the collective bargaining agreement contains no such limiting provision, to subject a unionized employee to arbitrary discipline resulting in a loss of employee rights and protections afforded by the agreement, without recourse to protest the employer's action, would render the agreement a mere sham and run counter to PERA's[3] objective to provide for mutual fair dealing by the parties with regard to employment issues.

*Hanover Sch. Dist. v. Hanover Educ. Ass'n*, 814 A.2d 292, 297 (Pa. Cmwlth.), *aff'd,* 839 A.2d 183 (Pa. 2003) (*per curiam*).  Thus, we decline to conclude that a provision limits the Arbitrator's authority where the provision purported to do so is vague rather than express.

With regard to the Association's first two arguments, based on the language of the CBA, we conclude that the Award was "not 'indisputably and generally [] without foundation in' the CBA, and it appears to 'logically flow

---

[3] Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-.2301.

from' the CBA." *Pennsylvania Turnpike Comm'n v. Teamsters Local Union No. 77*, 87 A.3d 904, 911 (Pa. Cmwlth. 2014) (quoting *Slippery Rock Univ. of Pa., Pa. State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. and Univ. Faculty*, 71 A.3d 353, 358 (Pa. Cmwlth.), *appeal denied*, 83 A.3d 169 (Pa. 2013)). Accordingly, the trial court erred in concluding that the Arbitrator's Award did not draw its essence from the CBA.

Because the trial court also concluded that, even if the Arbitrator's Award did draw its essence from the CBA, the Award should still be vacated because it contravened a public policy of the Commonwealth, we now address the Association's argument that the trial court erred in determining that the Arbitrator's Award fell within the public policy exception to the essence test. The public policy exception is a narrow exception, prohibiting a court from enforcing an arbitrator's award that contravenes public policy. *See Westmoreland*, 939 A.2d at 855. As explained by our Supreme Court, "a court should not enforce a grievance arbitration award that contravenes public policy. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* at 865-66. In *City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408 (Pa. Cmwlth.) (*en banc*), *appeal denied*, 32 A.3d 1279 (Pa. 2011), we set forth a three-step analysis to be used when considering whether an award violates public policy:

> First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. Third, we must determine if the [a]rbitrator's award poses an unacceptable risk that it

15

will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the [a]rbitrator.

*City of Bradford*, 25 A.3d at 414.

We must first determine the nature of the conduct leading to the discipline. Here, the trial court concluded that "it is fundamental that plagiarism and cheating are antithetical to learning and education and thus contrary to established policy." (Trial court op. at 6.) The Association argues that the Arbitrator found that Burns had merely failed to supervise properly the security of the PSSA administration and did not engage in conduct that constituted plagiarism or cheating.

We agree that the trial court mischaracterized the Arbitrator's factual findings when analyzing the public policy exception to the essence test. The trial court also stated: "Where, as here, there is no disagreement that school administration, if not the principal herself, have been implicated *in changing students' answers on a standardized test* over a two year period . . . public policy is offended." (Trial court op. at 6 (emphasis in original).) The Arbitrator unequivocally found that the District did not demonstrate that Burns was directly involved in changing or altering any PSSA answers. The Arbitrator found only that she was neglectful in failing to discover the cheating that was occurring. Thus, our inquiry is limited to whether reinstatement of an administrator found to be neglectful in the supervision of school employees and other administrators contravenes a well-defined, dominant, and readily-ascertainable public policy.

It is well-settled that we may not vacate an arbitrator's award under the public policy exception simply because the conduct at issue is unacceptable in a public employment setting. *City of Bradford*, 25 A.3d at 415. "There is no

16

public policy that mandates the discharge of all employees who are alleged to have committed a misconduct." *County of Mercer v. Teamsters Local 250*, 946 A.2d 174, 183 (Pa. Cmwlth. 2008). Prior case law has recognized areas where a dominant public policy would preclude the enforcement of an arbitrator's award. *Westmoreland Intermediate Unit No. 7 v. Westmoreland Intermediate Unit No. 7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA-NEA*, 977 A.2d 1205, 1211-12 (recognizing "a well-defined, dominant public policy to protect school children from illegal drugs and drug use"); *cf. New Kensington-Arnold Sch. Dist. v. New Kensington-Arnold Educ. Ass'n.*, 140 A.3d 26 (Pa. Cmwlth. 2016) (holding that teacher's conviction for possession of marijuana off-premises and during non-working hours did not require vacatur of arbitration award reinstating teacher.); *see also Philadelphia Housing Auth. v. Am. Fed'n of State, Cnty. and Mun. Emps., Dist. Council 33, Local 934,* 52 A.3d 1117 (Pa. 2012) (holding that arbitration award reinstating employee discharged for acts constituting sexual harassment, violated well-defined and dominant public policy); *North Penn Sch. Dist. v. North Penn Educ. Ass'n*, 58 A.3d 848, 858 (Pa. Cmwlth. 2012) ("[An award] under the public policy analysis [must draw] the necessary balance between the public employer's duty to protect the health, safety and welfare of the public, and the fair treatment of public employees"); *Shamokin Area Sch. Dist. v. Am. Fed'n of State, Cnty. & Mun. Emps. Dist. Council 86*, 20 A.3d 579 (Pa. Cmwlth. 2011) (recognizing public policy against violence towards students in schools).[4]

---

[4] We have previously held that an arbitrator's award which divests an educational institution of its authority to make employment decisions does not, by itself, violate any
**(Footnote continued on next page…)**

The District asserts that Burns' actions violate a well-defined public policy to protect students and public education and to preserve the integrity of the PSSA testing. The District requests that this Court recognize a broad public policy to protect students and public education. Although the overarching goal of our school system is to provide a thorough and efficient educational environment for children in the Commonwealth, the District's vague characterization of this policy would necessarily implicate any conduct occurring in a school setting, thus eviscerating the narrow public policy exception to the essence test. *See Philadelphia Housing Auth.*, 52 A.3d at 1125 (emphasizing that public policy exception is exceptionally narrow and particularized).

We do, however, recognize that a fundamental public policy exists to "preserve the integrity of the PSSA testing," in order to provide students in the Commonwealth with an effective learning environment, and, had the Arbitrator found Burns to be guilty of actively participating in altering PSSA tests, we would have no hesitation in affirming the trial court's conclusion that such conduct offends a well-defined and dominant public policy of the Commonwealth; however, this is not the case. Instead, the Arbitrator found only that Burns had failed in her supervisory responsibilities and in exercising oversight over PSSA test security. In other words, the Arbitrator essentially found that Burns engaged in negligent supervision.

**(continued…)**

well-defined, dominant public policy. *East Stroudsburg Univ. of Pa., State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. and Univ. Faculties*, 125 A.3d 870, 874 (Pa. Cmwlth. 2015).

18

We are constrained by the factual findings of the Arbitrator on appeal and, thus, must decide whether an award reinstating Burns, despite finding that she was negligent, violates a fundamental public policy. This Court has not previously recognized a public policy exception that would prevent an administrator from being reinstated based on mere negligence, and we decline to recognize one based on the facts of this case. Although the cheating which occurred at Tilden is abhorrent and such conduct must be rooted out, the Arbitrator found only that Burns failed to uncover the cheating and prevent it. Thus, we cannot conclude an award reinstating an administrator after finding her guilty of mere negligence violates a fundamental public policy. For the reasons set forth above, the trial court erred in concluding that the Arbitrator's Award was contrary to public policy and that the Award should be vacated.[5] Accordingly, the order of the trial court is reversed.

_____
P. KEVIN BROBSON, Judge

---

[5] Because we conclude that the Arbitrator's Award does not meet the second prong of the public policy exception, we need not analyze the Award under the third prong. *See City of Bradford*, 25 A.3d at 415.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

School District of Philadelphia      :
     :
      v.                    :    No. 152 C.D. 2016
     :
Commonwealth Association of      :
School Administrators, Teamsters    :
Local 502,                            :
                Appellant     :

# O R D E R

AND NOW, this 13th day of April, 2017, the order of the Court of Common Pleas of Philadelphia County (trial court), granting the School District of Philadelphia's petition to vacate the arbitration award, is REVERSED.

_____
P. KEVIN BROBSON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

School District of Philadelphia    :
    :  No.  152 C.D. 2016
    v.     :
    :  Argued:  February 7, 2017
Commonwealth Association of    :
School Administrators, Teamsters    :
Local 502,    :
          Appellant    :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge


***OPINION NOT REPORTED***

CONCURRING OPINION
BY JUDGE McCULLOUGH          FILED:  April 13, 2017


I concur in the result reached by the Majority.  However, I write separately because I disagree with the conclusion that the Arbitrator could interpret "cause" within the collective bargaining agreement (CBA) to mean "just cause."

I believe it is unnecessary to evaluate this matter under a "just cause" standard when the CBA only contains the term "cause."  If the meaning of "cause" cannot be gleaned from the four corners of the CBA, I believe we simply look to Section 1122(a) of the Public School Code of 1949 (Code),[1] which provides "[t]he only valid causes for termination of a contract . . . entered into with a professional employee. . . ."  24 P.S. §11-1122(a).

---

[1] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §11-1122(a).

Moreover, I do not read *Pennsylvania Game Commission v. State Civil Service Commission (Toth)*, 747 A.2d 887 (Pa. 2000), as countenancing the disregard of a statutory definition on point. I do not believe that *Toth* stands for the proposition that an arbitrator may ignore a statutory definition on point, and instead, effectively, insert a non-existent adjective into the CBA. As the Majority notes, while section 1122 of the Code defines "cause" and "prescribes the circumstances under which a school district *may* terminate a professional employee," it does not mandate termination for the conduct identified therein. (Slip op. at 9.) Hence, I agree with the Majority's conclusion that the Arbitrator had authority to determine that Michelle Burns did not act intentionally and to mitigate her termination to a 60-day suspension without pay and order her reinstatement. I also agree that the discipline imposed by the Arbitrator was not, under these circumstances, in violation of public policy.

_____
PATRICIA A. McCULLOUGH, Judge

PAM - 2